Decision and Journal Entry
{¶ 1} Appellant, NewStart Foundation, Inc., ("NewStart") appeals from the judgment of the Summit County Court of Common Pleas, Juvenile Division, denying its motion for permanent custody of the minor child, J.H., terminating the parental rights of the mother, Julie Ann Hamar, ("Mother") and granting legal custody of the child to the father, Rodney Lardell ("Father"). We affirm.
 {¶ 2} J.H. was born on October 25, 2000. His mother, Julie Ann Hamar, and his father, Rodney Lardell, were not married to each other. Prior to the birth of J.H., Mother and Father discussed the future care of the child. Mother wanted to place J.H. for adoption; whereas, Father did not. Father continued to attempt to visit Mother, but she refused to see him. The last meeting of the two was in September 2000. Father stated that he tried to convince Mother to raise the child with his help, but she would not agree to that.
 {¶ 3} Shortly before the birth of the child, Mother contacted NewStart, a private child placing agency licensed through the Ohio Department of Jobs and Family Services. On October 28, 2000, Mother executed a "permanent surrender" agreement with NewStart, with the intent of allowing the child to be adopted.[1] She also gave Father's name to NewStart as the biological father of the child.
 {¶ 4} Mother did not notify Father of the birth of the child or her actions in surrendering her parental rights to NewStart. Father learned of the child's birth through a third party. Father attempted to visit the child and bring him a gift while he was still at the hospital, but was not permitted to do so.
 {¶ 5} Thereupon, Father contacted Summit County Children's Services Board ("CSB") and was advised to register with the Putative Father Registry[2] as well as to contact the Child Support Enforcement Agency ("CSEA") in order to establish paternity. Father registered with the Putative Father Registry and also established paternity through DNA testing and a CSEA administrative hearing.
 {¶ 6} Eventually, Father learned that NewStart had possession of his son. In January 2001, he contacted NewStart and attempted to speak to Dona Setzer, the Executive Director of the agency. Ms. Setzer directed him to their legal counsel. Father then sought to obtain counsel, and did obtain counsel through Western Reserve Legal Services on April 2, 2001.
 {¶ 7} On May 18, 2001, NewStart filed a complaint in the Summit County Court of Common Pleas, Juvenile Division, alleging that the child was dependent, pursuant to R.C. 2151.04. The complaint states that Mother believes she is unable to provide for the child and desires to provide a stable two-parent home for him. The complaint recites that, to that end, she executed a permanent surrender of the child to NewStart, pursuant to R.C. 5103.03 and 5103.15. NewStart's complaint also alleges that Father is physically disabled (Father is blind.) and has abandoned the child.
 {¶ 8} On June 4, 2001, Father filed a motion seeking custody of J.H. The adjudicatory hearing was held on June 26, 2001. By stipulated agreement, J.H. was found to be a dependent child. Following waivers, the matter proceeded directly to disposition. The parties agreed that it was in the best interest of the child to remain in the custody of NewStart. As a basis for this finding, the magistrate relied upon the fact that Mother relinquished her parental rights to NewStart for the purpose of allowing him to be adopted. The magistrate also observed that no information was currently available regarding Father's situation, including "his ability to provide for the basic needs of [the child.]" The court ordered NewStart to amend the existing case plan to incorporate Father and to provide for visitation, which was held at the NewStart facility in Chardon. The case plan required Father to obtain drug abuse, psychological, anger management, and home study assessments; attend parenting classes; participate in supervised visitation; and pay child support.
 {¶ 9} On February 7, 2002, NewStart moved for permanent custody of the child. On February 28, 2002, NewStart was ordered to relocate supervised visitation to Summit County in an effort to facilitate reunification attempts by Father. Thereafter, visitation took place at the Family Visitation and Mediation Center ("FVMC") in Tallmadge with supervision being provided by Randy Flick, an employee of the Summit County Domestic Relations Court and FVMC.
 {¶ 10} On April 28, 2002, the case plan was amended to include Father's proposed assistant caregivers. On May 6, 2002, upon the concurrence of all parties, the court granted a six-month extension of temporary custody. On September 4, 2002, Father's motion for expanded in-home and off-site visitation, including relatives and potential caregivers, was granted. Also, at that time, the juvenile court noted the "failure of communication" between NewStart, FVMC, and Father, and "questioned the agency's `hands-off' approach to assisting Father with identified deficiencies." Father was directed to prepare a "thoughtful, specific, and complete written plan" for the care of the child. NewStart was admonished to work "in good faith" to assist Father in his efforts to parent.
 {¶ 11} NewStart renewed its motion for permanent custody on October 28, 2002. A five-day hearing was held in March, 2003. Following the hearing, the trial judge terminated Mother's parental rights; denied NewStart's motion for permanent custody; and granted legal custody of J.H. to Father, with an order of protective supervision by CSB.
 {¶ 12} NewStart has timely appealed and has assigned three errors for review. Neither Father nor Mother has appealed. We have rearranged the assignments of error for purposes of review.
Second Assignment of Error
"The Trial Court Erred As A Matter Of Law By Finding That Permanent Custody Was Not In The Best Interest Of The Child As Such Decision Was Contrary To Law And Against The Manifest Weight Of The Evidence."
 {¶ 13} Through this assignment of error, NewStart claims the weight of the evidence fails to support the trial court's conclusion that NewStart did not prove by clear and convincing evidence that permanent custody was in J.H.'s best interest. For the reasons that follow, we find the assignment of error to be without merit.
 {¶ 14} When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), 9th Dist. No. 18983, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
"The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 15} The relationship between parent and child is a "fundamental liberty interest." Santosky v. Kramer (1982), 455 U.S. 745, 753,71 L.Ed.2d 599. The right of parents to raise their own children is an "essential" and "basic civil right." In re Murray (1990),52 Ohio St.3d 155, 157, citing Stanley v. Illinois (1972) 405 U.S. 645,651, 31 L.Ed.2d 551. Furthermore, these protections have been extended to biological fathers of children, regardless of marital status, where they come forward and accept the full responsibility of parenthood. In reAdoption of Zschach (1996), 75 Ohio St.3d 648, 653. This vital interest "does not evaporate simply because [parents] have * * * lost temporary custody of their child to the State." Santosky, 455 U.S. at 753. This right, however, is not absolute.
 {¶ 16} A juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency if it finds clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99.
 {¶ 17} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must:
"[C]onsider all relevant factors, including, but not limited to, the following:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
"(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C.2151.414(D)(1)-(5).[3]
 {¶ 18} "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." See In re Smith, 9th Dist. No. 20711, 2002-Ohio-34; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, ¶ 24.
 {¶ 19} The juvenile court concluded that NewStart had failed to prove by clear and convincing evidence that permanent custody was in the best interest of J.H. We will review the evidence as it pertains to each of the statutory best-interest factors.
1. Interaction and interrelationship of the child
 {¶ 20} This factor requires consideration of the interaction and interrelationship between J.H. and Father, siblings, relatives, caregivers, and foster caregivers.
 {¶ 21} J.H. had lived with the foster family for six months, was reportedly doing well, and had bonded with them. The foster parents had expressed an interest in adopting the child. The NewStart caseworker and guardian ad litem stated their beliefs that the foster family would be a good placement for the child. NewStart, therefore, sought to establish that J.H. had not developed as good a relationship with Father, Father's family, and Father's potential assistant caregivers. They did so by attempting to point to a lack of bonding between the child and the relevant individuals. NewStart also sought to establish that Father was unable to provide for the child's needs.
 {¶ 22} Stacey Lann, the NewStart caseworker assigned to the case, observed early visitations at the NewStart facilities in Chardon and later transported the child to visitations in Summit County. Lann testified that J.H. had not bonded or shown affection to Father, relatives, or his potential assistant caregivers. At the same time, she admitted that Father tried to engage J.H., instructed the child on the computer, taught J.H. how to shake hands, to say a prayer before his snack, and to clean-up after himself.
 {¶ 23} Ann Hickin, a psychologist with Northeast Ohio Behavioral Health, conducted parenting and psychological evaluations of Father. She stated that there is "a certain kind of bond" between Father and the child. She explained that they have a relationship, but not a full or complete relationship as they have not lived together. The child, she stated, does not see Lardell as his father. She recommended counseling and parent training for Father.
 {¶ 24} The record indicates that Father was in counseling up through the time of the hearing in this matter and had participated in four different sets of parenting classes.
 {¶ 25} Dona Setzer, Executive Director of NewStart, testified that the agency has no concerns regarding either Gayle Blackmon or Catherine Lardell, the paternal grandmother, as assistant caregivers, although she stated that the caregivers have not established a relationship with the child. Setzer admitted that a parent-child relationship develops over time.
 {¶ 26} Jeff Myers, the guardian ad litem, stated that J.H. recognized Father as someone in his life, but the guardian ad litem saw no bond between Father and child. The guardian ad litem conceded that a bond is difficult to gauge in a young child, but defined a bond in a child this age as where a child would go to someone when they have been hurt or are crying. Apparently the guardian ad litem did not observe that behavior in J.H. However, Randy Flick, the FVMC visitation supervisor, independently testified that when a storm frightened J.H. during a visitation, he ran to Father. Father held him close and prayed with him: "Lord, please watch over us, my mommy, my daddy, and my friends and keep us safe."
 {¶ 27} In its appellate brief, NewStart disputes the finding of the juvenile court that Gayle Blackmon, a potential assistant caregiver, demonstrated an ability to bond with the child and to be an excellent caretaker. In support of its argument, NewStart cites as an example: Blackmon getting the child excited and Father having to calm him down. Flick observed the same events, but concluded that Blackmon and Father could work out their disagreements.
 {¶ 28} NewStart also complains that Blackmon had not completed a psychological evaluation, although Lann and Setzer both testified that they had "no concerns" about Blackmon being around the child. Blackmon has 20 years of experience as a child care provider for MRDD and currently works with the Kent City Schools as a teacher assistant for children with behavior problems. She was recommended as an assistant caregiver by Joanne Hannah, the child life specialist at Children's Hospital and coordinator of two outreach programs.
 {¶ 29} NewStart also argues that the trial court erred in concluding that Father is able to provide for the child's needs, and instead asserts that Father requires full-time assistance. However, the care plan developed by Father acknowledges that fact and is based upon 24-hour in-home assistance. Beyond that, by all accounts, Father enthusiastically and successfully participated in four different sets of parenting classes.
 {¶ 30} For his part, Father testified that from the time of the child's birth, he consistently made efforts to locate the child, visit him, bring him gifts, establish paternity, and obtain custody of him. Yet, NewStart did not permit Father to visit J.H. until August 3, 2001, more than nine months after his birth and six months after paternity was established. Even then, visitation for the first six months took place in Chardon, and for only one hour per week. Relatives and future caregivers were not permitted to participate in visitation at the NewStart facility. The stated reason was to promote bonding of the child with Father.
 {¶ 31} By order of the juvenile court, visitation was moved to Summit County, and supervisory responsibility was taken over by Robert Flick. For the last six months, visitation was moved to Father's apartment or various off-site locations and was expanded to three hours. According to Flick, much progress was made during the visitations he observed.
 {¶ 32} Father testified that the NewStart caseworker did not help him bond with his son as much as she could have. She provided no encouragement or optimism. Father stated he did not trust NewStart, and did not believe that they were working to reunite him with his child. He stated that they put a lot of "hurdles" in his way.
 {¶ 33} In ten years of working with NewStart, Lann said she had been involved in only one or two cases where the birth parent regained custody of a child. In addition, the record reflects that NewStart indicated that it was seeking permanent custody as a final disposition in this matter from the time of the filing of its initial complaint.
 {¶ 34} On the other hand, Father also testified that Randy Flick, who supervised 26 visits at FVMC from April 2002 through October 2002, was friendly, honest, encouraging, respectful, professional, and offered helpful opinions. Father stated that he was more comfortable at FVMC and that the people there seemed willing to help him bond with his child. Flick suggested expanding visitations and going out of doors on nice days or for off-site visits.[4]
 {¶ 35} Flick testified regarding the visitations he supervised. He reported that the visits had progressed well and J.H. appeared more and more comfortable with Father. Father and son developed a bond over the six months of extended visitations he observed. J.H. would freely go to his father's lap and laugh with him. Father was able to entice J.H. into activities, taught him manners, and calmly redirected misbehavior. Flick never observed Father to be inappropriate with J.H., nor lose his patience with the child, even when the child was asserting his independence. Father constantly praised J.H. on the way he was dressed, on his hair, when he picked up toys, cleaned up after himself, or showed that he could count. Father had a cell phone, but would turn it off during visits, believing that this was his time to share with his son. At the end of the visits, Father frequently kissed J.H., and J.H. would kiss him back. As the visits progressed, the hugs and kisses that went with good-byes came easier.
 {¶ 36} Flick observed Gayle Blackmon during two visits with the child and Father. They all played and laughed together. During one of these visits, Flick observed the child to "come out of himself" even more with Father.
 {¶ 37} Flick admitted that the NewStart caseworker became upset with him if Father was late for visitation and Flick was still willing to permit the visit. When he began supervising visits, the NewStart caseworker told Flick, "[W]atch him closely. [I]f you give him an inch, he'll take a mile[.]" The caseworker also expressed concern that Father would introduce other people to the child, when some of the visits were moved outside of NewStart's facility.
 {¶ 38} Joanne Hannah, child life specialist at Children's Hospital and one of Father's parenting instructors, testified on behalf of Father. Hannah was scheduled to participate in a visitation with the child at Father's home, but NewStart cancelled the session because it questioned whether Father was eligible for the services Hannah provided. Hannah observed that many fathers do not want to be involved with their children, and this is someone that does, is willing to learn and to do what he needs to do. She wrote in a July 2002 letter to NewStart:
"Rodney has shown enthusiasm, perseverance and the ability to take on the challenge of rearing his child. Once the child is placed with him, he will continue to receive Early Start services which include weekly home visits, monitoring of the child's development, providing educational information, transportation, and help with all resources and interventions that would be appropriate for Rodney and his family."
 {¶ 39} Catherine Lardell, paternal grandmother, testified that she was happy to help her son care for J.H., and that she was willing to have them stay at her home — especially whenever Gayle Blackmon was unable to help. She was not allowed to see the child until the visits were moved to FVMC and her son's apartment. She testified that she believed she bonded right away with J.H. They hugged and kissed.
 {¶ 40} The juvenile court found that Father, paternal grandmother, and Gayle Blackmon all had a positive relationship with the child and possessed the ability to bond with him. The juvenile court also observed that NewStart was reluctant and very slow in its attempts to reunify the child with his father. The court noted that Father had completed many parenting classes and has been eager to improve his parenting skills. The court found that any shortcomings in Father's ability to parent arose more from the fact that he had not had the child with him for any extended periods due to no fault of his own.
2. Custodial history of the child
 {¶ 41} J.H.'s custodial history was that he had been within the control or custody of NewStart for twenty-eight months, or his entire life. While this long period away from his father is significant, "the time period in and of itself cannot be held against the parent without considering the reasons for it and the implications that it had on this child." In re Smith, supra. It is relevant, therefore, to review the context of this delay and consider the reasons for it.
 {¶ 42} When Mother surrendered her parental rights to the child shortly after his birth, she also provided the name of the father to NewStart. Within a month, the agency was aware of the interest of Father in the child. Within two months, the agency knew Father was seeking paternity testing in order to obtain custody. Within three months, paternity was established. Yet it took five more months and court intervention before Father was even permitted to visit with his son. J.H. was in the control of NewStart for seven months before the matter was brought to the attention of the juvenile court.[5]
 {¶ 43} Despite the fact that NewStart urges this Court to consider that the child had been in the custody of the agency for more than 12 out of 22 consecutive months, NewStart first made this argument only seven months after the juvenile court officially placed the child in its temporary custody. In addition, all parties — including NewStart — agreed to a six-month extension of temporary custody in May 2002, based on the shared belief that progress was being made by Father.
 {¶ 44} As noted above, NewStart has been reluctant in its attempts to reunify Father and child. All efforts to move the visitation site closer to Father's home or to increase the length of time beyond one hour per week were at the suggestion of Randy Flick, the FVMC supervisor, or the juvenile court — and not NewStart.
 {¶ 45} Father has been present at all hearings, has completed all assessments required by his case plan, has continued counseling, has attended 75 to 85% of the scheduled visitations — despite many of them being held out of county, has taken four sets of parenting classes, has made plans for an experienced caregiver to stay in his home Monday through Friday and to obtain help from his mother on weekends.
3. Wishes of the child
 {¶ 46} The wishes of the child, being of tender years, may be expressed through the guardian ad litem. The guardian ad litem in this case recommended that the child be placed in the permanent custody of the agency. The trial court, however, is not bound by the guardian ad litem's recommendation. In re Andrew B., 6th Dist. No. L-01-1440,2002-Ohio-3977, at ¶ 64.
"The function of a guardian ad litem or for a representative for the child is to secure for such child a proper defense or an adequate protection of its rights. The ultimate decision in any proceeding is for the judge and not for the representative of the parties and the trial court did not, for that reason, err in making an order contrary to the recommendation of the child's representative * * *." In re Height
(1975), 47 Ohio App.2d 203, 206.
 {¶ 47} The juvenile court recognized the report of the guardian ad litem, but attached little weight to its conclusion. This is not unreasonable in light of the guardian ad litem's analysis. The guardian ad litem's main difficulties were that the child and caregivers were not yet in Father's home and that there was a lack of bonding between Father and child.
 {¶ 48} As to the first point, the guardian ad litem hypothesized that if the child was already in the home and the caregivers were in place, he might have a different opinion. The trial judge obviously was not persuaded by the argument. Nor are we, particularly in light of the delays in this proceeding attributable to NewStart.
 {¶ 49} The guardian ad litem also stated that while bonding is difficult to discern in a child of this young age, he did not believe the father and child had sufficiently bonded. In explaining this conclusion, the guardian ad litem interpreted bonding as being exemplified by a child running to a trusted adult when frightened. As stated above, Flick provided just such an example of J.H. turning to his Father.
 {¶ 50} Finally, the guardian ad litem admitted that he had suggested longer visitations and moving them closer to Father's home, but said that NewStart resisted such efforts because Father had not yet completed his case plan.
4. Permanent placement
 {¶ 51} The fourth factor requires consideration of the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. The juvenile court found that a legally secure permanent placement can be achieved without a grant of permanent custody. The court found that Father has achieved a plan that will allow him to provide a permanent and secure placement for his son. Although Father is blind, he is able to provide for his son's basic needs. Father has also developed a 24-hour a day, seven-day-a-week care network that will allow for him to receive assistance in caring for his son.
 {¶ 52} NewStart complains of Father's need for 24-hour assistance, yet at the same time complains about there being a series of caregivers. NewStart cannot have it both ways. The trial judge was satisfied with the plan developed by Father. NewStart also expresses unsubstantiated doubts that the assistant caregivers will keep the commitments they made. The trial judge was able to see and hear the witnesses before her, and to evaluate their sincerity and credibility.
 {¶ 53} Upon careful review of the record in this case, we do not find that the trial court "clearly lost its way and created such a manifest miscarriage of justice" that a new trial must be ordered.Thompkins, 78 Ohio St. at 387. The judgment of the trial court is supported by the weight of the evidence. The second assignment of error is overruled.
First Assignment of Error
"The Trial Court Erred As A Matter Of Law By Finding The Appellant-agency Failed To Demonstrate That The Father Is Unfit Or Unable To Provide A Suitable Home For The Child, Thereby Applying The Wrong Legal Standard."
 {¶ 54} In this assignment of error, NewStart asserts that the trial court utilized the wrong legal test for permanent custody when it declared that NewStart failed to establish that Father was unfit or unable to provide a suitable home for the child.
 {¶ 55} While NewStart accepts the validity of the statutory test for permanent custody required by R.C. 2151.414(B), NewStart also urges that unfitness need not be proved where dependency has already been established. NewStart cites In re D.R., 153 Ohio App.3d 156,2003-Ohio-2852, in support of its position. That case, concerning a relative's motion for legal custody vis-á-vis a parent, is not controlling in the present matter, which requires a decision on an agency's motion for permanent custody and the termination of parental rights.
 {¶ 56} As set forth above, before a child may be placed in the permanent custody of a proper moving agency, the trial court must find not only that (1) the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 of a consecutive 22 period, or that the child cannot be placed with either parent, but also that (2) the grant of permanent custody to the agency is in the best interest of the child. See R.C. 2151.414(B). Here, the juvenile court found that a grant of permanent custody to NewStart was not in the best interest of the child. In addition, the juvenile court indicated that NewStart failed to establish that Father was unfit or unable to provide a suitable home for J.H. While the trial court's finding did not mimic the exact words of the applicable statute, R.C. 2151.414(B), the finding might arguably be considered to be of the same effect as the statutory language.
 {¶ 57} However, because parental rights may not be terminated unless both portions of the statutory test are met and because we have already concluded that NewStart failed to meet the best interest portion of the test, the question of whether proof exists as to the other portion becomes inconsequential. The question is, therefore, rendered moot. Accordingly, we need not reach the merits of the first assignment of error. App.R. 12(A)(1)(c).
 Third Assignment of Error
"The Trial Court Erred In Committing The Child To The Legal custody Of The Birth Father With An Order of Protective Supervision By Children Services And Abused Its Discretion In Considering The Interest Of the Birth Father Above The Best interest of the child and in terminating the rights of the birth mother when granting legal custody to the birth father which was also contrary to law."
 {¶ 58} Through this assignment of error, NewStart contends that the trial court erred in placing the child in the legal custody of Father, with an order of protective supervision by CSB, and in terminating the parental rights of Mother.
"`Protective supervision' means an order of disposition pursuant to which the court permits an abused, neglected, dependent, or unruly child to remain in the custody of the child's parents, guardian, or custodian and stay in the child's home, subject to any conditions and limitations upon the child, the child's parents, guardian, or custodian, or any other person that the court prescribes, including supervision as directed by the court for the protection of the child." R.C. 2151.011(B)(39).
 {¶ 59} Having found that the trial court did not err in denying NewStart's motion for permanent custody, we find no prejudice to NewStart in the juvenile court placing legal custody in Father and in ordering protective supervision of the child by CSB.
 {¶ 60} We similarly find no prejudice to NewStart in the termination of parental rights of Mother. Mother voluntarily surrendered her parental rights to the child. The trial court found that her parental rights were terminated. Mother has not appealed from that judgment. We find no prejudice to NewStart in this order of the juvenile court. The third assignment of error is accordingly overruled.
 {¶ 61} Accordingly, the judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
CARR, J., WHITMORE, J. CONCUR.
[1] During these proceedings, Mother attempted to vacate her permanent surrender agreement, later reinstituted her surrender with an alternate motion for legal custody, and still later withdrew her motion for legal custody. In the end, she has not appealed the judgment of the trial court, and she is not a party to this appeal.
[2] A December 21, 2000 search of the registry, requested by NewStart, erroneously reported that no father had registered. A February 22, 2001 search resulted in a report that Rodney Lardell had registered as the putative father.
[3] Factors referenced through R.C. 2151.414(D)(5) are not relevant to this case.
[4] NewStart suggested that it also offered assistance to Father by making referrals for the assessments it required. While such referrals are helpful, Father's comments are directed to the more informal and attitudinal assistance that comes through the very manner in which required procedures are performed.
[5] No objection was raised to the lengthy delay by NewStart before bringing this matter to the attention of the juvenile court. Nevertheless, this delay is a matter of concern to this Court. Under both R.C. Chapter 2151, regarding the involuntary removal of children from the custody of their parents, and R.C. Chapter 5103, regarding the voluntary surrender of children to an agency for purposes of adoption, public and private agencies are subject to statutory regulation in bringing the fact of custody of children by their agencies to the attention of the juvenile court. Ohio's statutory schemes anticipate the invocation of appropriate judicial oversight whenever children are removed from the custody of their parents. See, also, Angle v. Children's Services Div. (1980),63 Ohio St.2d 227, paragraph two of the syllabus (holding that there can be no permanent surrender of a child until the consent of juvenile court has been journalized).