DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a Ross County Common Pleas Court, Juvenile Division, judgment that awarded Ross County Department of Job and Family Services (RCJFS) permanent custody of Shane Leasure, born July 17, 2002, and Sarah Keaton, born April 2, 2000.
 {¶ 2} In Case No. 04CA2785, Appellant Tony Keaton, the natural father of the children, raises the following assignments of error:
First Assignment of error:
"The trial court erred in holding that legal custody cannot be granted to the keatons because they have filed to fail [sic] a motion for legal custody."
Second Assignment of error:
"The trial court erred when it concluded as a matter of law that it was not in the children's best interest to be placed with the keatons, who were a suitable relative placement."
Third Assignment of error:
"The trial court's finding that the agency exercised reasonable efforts to reunify the children with their father and finding that reunification with father within a reasonable period of time is not possible are not supported by clear and convincing evidence."
Fourth assignment of error:
"The trial court's finding that the keatons `asked for [the children's] immediate removal due to not wanting to deal with the mother of the children' is not supported by clear and convincing evidence."
 {¶ 3} In Case No. 04CA2788, Appellant Tracey Gowen, the natural mother of the children, raises the following assignments of error:
First Assignment of error:
"The trial court erred to the prejudice of appellant when it entered judgment granting permanent custody of the children herein to ross county job and family services where such judgment was against the manifest weight of the evidence."
Second assignment of error:
"The trial court erred to the prejudice of appellant when it entered judgment granting permanent custody of the children herein to ross county job and family services where such judgment was not in the best interest of the children."
 {¶ 4} On August 22, 2002, RCJFS filed a complaint that alleged: (1) in July of 2002, RCJFS received a report that Norman Leasure,[1] Tracey's boyfriend, struck her in the face and kicked her in the vaginal area; (2) Norman was arrested for domestic violence; (3) RCJFS previously has removed six other children from Tracey's custody; (4) on August 5, 2002, the mother called Lori Humphries and stated that on August 4, 2002 Tony struck her and that she and the two children were residing in the domestic violence shelter; (5) Laura Butt received a report that Tony sexually abused Sarah;[2] (6) on August 7, 2002, RCJFS received a report that the domestic violence shelter staff observed Tracey pick Sarah up, throw her on the couch, and repeatedly strike her on the face, stomach, and back; (7) the staff saw Tracey leave Shane in soiled diapers for extended periods of time and witnessed the mother shouting profanities at Sarah that caused the child to cry; (8) on August 8, 2002, the mother was kicked out of the domestic violence shelter; and (9) on August 16, 2002, the mother reported that she, Norman, and the two children were staying at the Chillicothe Inn because they did not have a home. The complaint requested that the trial court find the children to be dependent and award temporary custody to RCJFS.
 {¶ 5} On April 1, 2003, the court adjudicated the children dependent. On August 5, 2003, RCJFS filed a motion for permanent custody.
 {¶ 6} A few days before the permanent custody hearing, both Tracey and Tony requested the court to place the children in the legal custody of the children's paternal grandparents, John and Patricia Keaton.[3] RCJFS opposed the motion, referring to the following letter from RCJFS caseworker Teresa Babb in which she stated:
"I have spoken with Mr. and Mrs. John Keaton. They are very much interested in having legal custody of both children but are uncertain exactly what `legal custody' means. They have stated that they would be willing to allow Tracey and Tony to visit the children in their home if the Court permits. They stated they would not allow Tracey nor Tony to visit their home if they appear to be under the influence of drugs or alcohol and they would not allow either to take the children with them unless they show they have changed their present lifestyles for a minimum of six months. They also stated they would be willing to move out of this area if Tracey harasses them or the children. Even though the Keatons feel they have the best interest of the children in mind at this time, how assured can we be how committed they will remain[?] After having the children in their home for nine months during which time the children bonded with them, they asked the children to be moved from their home because of circumstances involving Tracey. The Keatons have an enabling relationship with Tracey. I fear they will let their good intentions towards Tracey not be so good for the children in the long run."
 {¶ 7} In a separate letter, Babb stated:
"[RCJFS] feels that it is in the best interest of Sarah and Shane to have their parents' rights terminated. If the Keatons are given legal custody, the parents will continue to have involvement in these children'[s] lives and will continue to be able to influence them. It is also unknown if John Keaton is in fact Tony Keaton's father or his great-uncle. In either case, the children were previously placed in the foster care home of John Keaton for nine months and abruptly, the Keatons asked the children to be moved from their home. The Keatons have had nine more months to ask for legal custody of the children so why have they waited only four days before the permanent placement hearing before they decided to make such a request."
 {¶ 8} At the April 5, 2004 permanent custody hearing, Scioto Paint Valley Mental Health Center social worker Teresa A. Wills testified that she assessed the mother for substance abuse and that the mother abused amphetamines, alcohol, and opiates.
 {¶ 9} Ruth Burke stated that Tracey lived with her in October to November of 2003 because she did not have anywhere else to stay. Burke stated that Tracey took money from her purse and took about twenty DVDs. Burke also stated that Tracey took a gold necklace and pawned it. She testified that Norman stayed at her house with Tracey for about three weeks, but Burke asked him to leave because he and Tracey argued.
 {¶ 10} RCJFS caseworker Teresa Babb testified that she attempted to reunify the children with Tracey, but Tracey had positive drug screens and was arrested. She stated that she initially developed a case plan for Tracey and Norman and that when she learned that Tony is Shane's father, she amended it to include Tony and to remove Norman. Babb stated that at first, she did not have contact with Tony because she did not know his location. She stated that she heard that he was in prison and Tony sent a letter to RCJFS stating that he was in prison. Babb testified that in January of 2004, Tony's attorney provided her his Florida address and a phone number. Babb called him and provided the case plan to the attorney.
 {¶ 11} Babb stated that the case plan required Tracey to: (1) find a place to live; (2) seek employment; (3) attend counseling; (4) participate in AA or mental health programs; (5) stay away from assaultive adults, especially Norman; (6) refrain from incidents of domestic violence with Norman; and (7) not use physical discipline with the children. Babb testified that she visited the most recent place that Tracey found to live and concluded that it was not suitable for the children. She stated that the residence had holes in the floor and a bird's nest in the kitchen, that it was roach infested, and that it lacked bedding for the children. Babb stated that Tracey has continued to test positive for amphetamines, opiates, and cocaine. Babb also stated that Tracey has not been able to maintain stable employment.
 {¶ 12} Babb testified that Tony also has not complied with the case plan. She explained that Tony has not: (1) completed anger management or attended domestic violence counseling; (2) established a bond with Sarah; (3) attended parenting classes; or (4) undergone a substance abuse assessment.
 {¶ 13} Babb stated that in the fall of 2002, she placed the children with the Keatons, who she thought were the children's paternal grandparents. The children remained there until June 6, 2003. Babb explained the circumstances that led to the children's removal from the Keatons' home. She stated that for a couple of weeks before the children's removal, they had been coming to the office with head lice. Tracey had been calling to express concern about the children contracting head lice while in a foster home. Babb discussed with the Keatons the need to treat the children for lice and "they asked me to have the children removed from the home." She testified:
 {¶ 14} "The * * * Keaton's [sic] have had [an] ongoing conflict at times with * * * [the mother]. And * * * she has * * * caused them, harassed them numerous times. When I moved the children * * * after being in their home for nine months, * * * they explained to me at that time that they couldn't deal with * * * [the mother] any longer, and they wanted the children removed from their home because of that. * * * I fear that she would be able to continue to have an involvement in their home."
 {¶ 15} She stated that she had a concern about placing the children in the Keatons' legal custody because "[t]hey asked for the children to be moved once. * * * I don't know what would happen if they * * * became agitated again and asked for the children to be removed again." Babb also explained that the Keatons chose to keep in their home the other foster children who they claimed transmitted the lice to Sarah and Shane, instead of Sarah and Shane. She stated that when Sarah and Shane were removed, the Keatons blamed the lice problem on the other foster children who were in the home. The Keatons claimed that the other children returned from visits with their parents with lice.
 {¶ 16} Babb testified that the children are doing well in the current foster home with the Seyfangs. She stated that the children are respectful and follow directions. Babb testified that permanent custody with adoption as the goal is in the children's best interests and that placing them in the Keatons' legal custody is not in their best interests. She stated that placing them with the Keatons is not in the children's best interests because "the children will continue to be * * * confronted with their natural parents if they're placed in the legal custody of the Keaton's [sic]. I don't feel that that's in the children's best interest to maintain a relationship with their biological parents."
 {¶ 17} Christopher Seyfang, the children's current foster father, testified that when Sarah first came to his home, she did not listen very well, she hit Shane, and she cussed. Seyfang stated that Sarah now is well-mannered. Seyfang explained that after visits with her mother, Sarah lost structure and sometimes she "pooped herself after visits." Seyfang testified that Shane had diarrhea after visits with the mother.
 {¶ 18} John Keaton testified that he is not certain whether he is Tony's father. He explained that both he and his brother "went out" with Tony's mother.
 {¶ 19} Keaton offered the following account of why Sarah and Shane were removed from his home. He stated that Tracey kept calling and that one day, she called thirty times in one day. On the day that the children were removed, when the Keatons brought the children to visit with Tracey, Tracey found lice on Sarah's head. Babb told Mrs. Keaton that if the children had one more incident of lice, then RCJFS would remove the children. Keaton testified that his wife was crying and told him what Babb stated. He then stated: "but one more incident, we're going to have it because I had four children at that time. And every time they went home to their parents, they had rabbits, cats, dogs, chickens, and they had all this stuff in their house." Keaton told Babb that "you just might as well keep `em now, `cause . . . uh . . . I. She said well why don't you give the other four children up? Well, I had an obligation to them, too." Keaton claimed that they decided to return the children because of Babb's "threat."
 {¶ 20} On April 23, 2004, the guardian ad litem filed his report and agreed with RCJFS that "neither parent is or will be suitable caretakers within a reasonable time, and that it would be in the children's best interests to have the parents' rights permanently terminated." Contrary to RCJFS's position, however, he recommended that the court place the children in the Keatons' custody.
 {¶ 21} On May 5, 2004, the magistrate recommended that the court grant RCJFS permanent custody. The magistrate found: (1) the mother has failed to complete counseling and remain drug free; (2) she has failed to maintain suitable housing, having thirteen different addresses since August of 2002; (3) the father has failed to maintain contact with the children or RCJFS caseworkers; (4) the father failed to attempt to complete the case plan; (5) the father was in prison for part of the time that RCJFS was attempting reunification; (6) the parents have failed to remedy the conditions causing the children's removal; (7) reunification with either parent is not possible within a reasonable period of time; (8) RCJFS used reasonable efforts; (9) the children were in the Keatons' care until the Keatons asked for their removal because they did not want to deal with the mother; (10) the children are doing "very well" in their current foster care placement; (11) permanent custody is in the children's best interest; (12) legal custody cannot be granted to the Keatons because they did not file a motion; and (13) legal custody to the Keatons is not in the children's best interests.
 {¶ 22} Both parents objected to the magistrate's decision. On June 23, 2004, the court overruled the objections. The court first observed that the mother did not appear at the April 5, 2004 hearing. In responding to the objection that the Keatons requested the children's removal from their home, the court noted that the caseworker testified that she met with the Keatons
 {¶ 23} "and they asked her to have the children removed from the home and that they did not want the children returned to their home. The caseworker further testified that the Keatons explained that they could not deal with the mother any longer and that was the reason they sought the removal. She testified, `they (the Keatons) didn't want to put up with [the mother] bothering them any more.' When asked what led up to the removal of the children from his home, John W. Keaton stated that the mother called more than thirty times one day when she was supposed to be limited to one phone call a week. He also expressed his concern about the father being around the children while he was drinking. Additionally, Keaton testified that the social worker cautioned him about the children's head lice, stating that if they were discovered again the children would have to be removed from the home. Apparently Keaton thought there would be more lice incidents and directed that the children be removed from his home."
 {¶ 24} The court found from the above testimony "it is clearly established that Keaton requested the removal of the children from the home. While Keaton may have had multiple reasons for requesting the immediate removal of the children, one of those reasons was to avoid having to deal with the children's mother." {¶ 25} The court further determined that it was not required to award legal custody to the Keatons. It noted that questions remained regarding whether John Keaton is Tony's father. Paternity had not been established and when Tony was conceived, his mother had been dating three different men, including John Keaton. The court stated: "Even if John W. Keaton is the paternal grandfather of the children, there is no requirement in law that mandates placement with a relative."
 {¶ 26} The court also overruled the father's objection to the magistrate's finding that he did not attempt to complete the case plan. The court found that the testimony did not support his claim that the agency did not refer him to services to help him complete the case plan and that the case plan requirements were not conveyed to him. The court stated:
 {¶ 27} "The caseworker testified that initially there were some paternity issues in the case and that she did not know the whereabouts of Tony Keaton. When it was determined that Tony Keaton was the father, the agency learned that he was in a prison somewhere. The agency later learned from father's attorney that he was located in the State of Florida and the agency was given an address and phone number by the attorney. When the case plan was filed with the Court in June, 2003 a copy was delivered to father's attorney. When the caseworker spoke with the father in January, 2004 the father was familiar with some elements of the case plan. According to the caseworker, a copy of the case plan was given to father when he visited with the children in March, 2004."
 {¶ 28} The court thus determined that the father's "assertions in his objections that the caseworker never communicated with him about the case plan and that he never received a copy of it are not supported by the evidence and appear to be false in their entirety."
 {¶ 29} The court overruled the father's objection to the magistrate's finding that the agency made reasonable efforts to reunify the family. The court stated: "the transcript is replete with testimony of the agency's efforts toward the goal of family reunification."
 {¶ 30} The court additionally overruled the father's objection to the magistrate's finding that the children need a legally secure permanent placement that cannot be achieved without granting permanent custody. The court stated that placing the children with the Keatons would not be in the children's best interests. The court stated: "From the testimony presented it appears that the Keatons' commitment to the children has been somewhat inconsistent, particularly in light of the Keatons' ongoing relationship with the parents."
 {¶ 31} Citing R.C. 2151.353(A), the court further overruled the father's objection to the magistrate's finding that it could not grant the Keatons legal custody because they did not file a motion requesting custody.
 {¶ 32} Last, the court overruled the father's objection to the magistrate's finding that granting legal custody to the Keatons would not be in the children's best interests. The court found that the evidence and testimony "clearly established" that granting legal custody to the Keatons would not be in the children's best interests.
 {¶ 33} Both the mother and the father timely appealed the trial court's judgment.
 I {¶ 34} Because both the mother's and the father's appeal rests upon some basic principles governing permanent custody decisions, we first set forth those principles that govern our resolution of both appeals.
 A STANDARD OF REVIEW {¶ 35} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr. Co.
(1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus; see, also, Wardeh v. Altabchi 158 Ohio App.3d 325,2004-Ohio-4423, 815 N.E.2d 712. A reviewing court affords every reasonable presumption in favor of the trial court's judgment and findings of fact, and evidence susceptible of more than one interpretation is construed consistently with the trial court's judgment. Wardeh v. Altabchi 158 Ohio App.3d 325,2004-Ohio-4423, 815 N.E.2d 712 (citing Gerijo, Inc. v.Fairfield (1994), 70 Ohio St.3d 223, 226, 638 N.E.2d 533).
 {¶ 36} We note that our role as a reviewing court does not permit us to re-weigh the evidence and to assess the credibility of witnesses. Rather, as stated in State v. Awan (1986),22 Ohio St.3d 120, 123, 489 N.E.2d 277, 280, appellate courts must defer conflicts in the evidence to the trier of fact who had the opportunity to hear witnesses and observe their demeanor: "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its judgment for that of the trier of fact." Inre Harmon (Sept. 25, 2000), 00CA2693.
 B STANDARD GOVERNING PERMANENT CUSTODY DECISIONS {¶ 37} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children.Santosky v. Kramer (1982), 455 U.S. 745, 753, 102 S.Ct. 1388,71 L.Ed.2d 599; In re Murray (1990), 52 Ohio St.3d 155, 156,556 N.E.2d 1169. The parent's rights, however, are not absolute. Rather, "`it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the pole star or controlling principle to be observed.'" In reCunningham (1979), 59 Ohio St.2d 100, 106, 391 N.E.2d 1034
(quoting In re R.J.C. (Fla.App. 1974), 300 So.2d 54, 58). Thus, the state may terminate parental rights when the child's best interest demands such termination.
 {¶ 38} R.C. 2151.413 permits a public children services agency that has temporary custody of a child to file a motion requesting permanent custody of the child. In considering a motion filed pursuant to R.C. 2151.413, the trial court must follow the guidelines set forth in R.C. 2151.414.
 {¶ 39} R.C. 2151.414(A)(1) requires a trial court to hold a hearing regarding the motion for permanent custody. The primary purpose of the hearing is to allow the court to determine whether the child's best interests would be served by permanently terminating the parental relationship and by awarding permanent custody to the agency. See R.C. 2151.414(A)(1)
 {¶ 40} When considering a request for permanent custody, a trial court should consider the underlying principles of R.C. Chapter 2151:
To provide for the care, protection, and mental and physical development of children * * *;
* * *
To achieve the foregoing purpose, whenever possible, in a family environment, separating the child from its parents only when necessary for his welfare or in the interests of public safety.
 {¶ 41} R.C. 2151.01.
 {¶ 42} We note that clear and convincing evidence must exist to support a permanent custody award. The Ohio Supreme Court has defined "clear and convincing evidence" as follows:
"The measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal."
 {¶ 43} In re Estate of Haynes (1986), 25 Ohio St.3d 101,103-04, 495 N.E.2d 23; see, also, State v. Schiebel (1990),55 Ohio St.3d 71, 74, 564 N.E.2d 54. In reviewing whether a trial court's decision is based upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." Schiebel, 55 Ohio St.3d at 74. If a trial court's judgment is "supported by some competent, credible evidence going to all the essential elements of the case," a reviewing court may not reverse that judgment. Id.
 {¶ 44} Moreover, "an appellate court should not substitute its judgment for that of the trial court when there exists competent and credible evidence supporting the findings of fact and conclusion of law." Id. Issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. As the court explained in Seasons CoalCo. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273:
 {¶ 45} "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony."
 {¶ 46} R.C. 2151.414(B)(1) permits a trial court to grant permanent custody of a child to a children services agency if the court determines, by clear and convincing evidence, that the child's best interest would be served by the award of permanent custody and that one of the following conditions applies:
(a) The child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999.
 {¶ 47} R.C. 2151.414(E) sets forth the factors a trial court must consider in determining whether a child cannot or should not be placed with either parent within a reasonable time. If the court finds, by clear and convincing evidence, the existence of any one of the following factors, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent":
(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
(2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code;
(3) The parent committed any abuse as described in section2151.031 of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
(5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
(6) The parent has been convicted of or pleaded guilty to [certain criminal offenses] and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.
(7) The parent has been convicted of or pleaded guilty to [certain criminal offenses];
(8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
(11) The parent has had parental rights involuntarily terminated pursuant to this section or section 2151.353 or2151.415 of the Revised Code with respect to a sibling of the child.
(12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
(13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
(14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
(15) The parent has committed abuse as described in section2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
(16) Any other factor the court considers relevant.
 {¶ 48} A trial court may base its decision that a child cannot or should not be placed with either parent within a reasonable time upon the existence of any one of the above factors. The existence of one factor alone will support a finding that the child cannot be placed with either parent within a reasonable time. See In re William S. (1996), 75 Ohio St.3d 95,661 N.E.2d 738; In re Hurlow (Sept. 21, 1998), Gallia App. No. 98 CA 6; In re Butcher (Apr. 10, 1991), Athens App. No. 1470.
 {¶ 49} R.C. 2151.414(D) requires a trial court to consider specific factors in determining whether a child's best interests would be served by granting a motion for permanent custody. The factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C.2151.414(E)(7) to (11) apply.
 II Case No. 04CA2785 {¶ 50} A {¶ 51} In his first assignment of error, the father argues that the trial court erred by determining that it could not grant the Keatons legal custody because they did not file a motion for legal custody.
 {¶ 52} Because the record fully supports the trial court's decision that granting the Keatons legal custody would not serve the children's best interests (see our discussion of the father's second assignment of error), we believe that any error the court may have committed does not affect the outcome of the father's appeal. Thus, we will not address the father's first assignment of error.
 B {¶ 53} In his second assignment of error, the father asserts that the trial court erroneously determined that placing the children with the Keatons would not serve their best interests. He contends that: (1) the court failed to consider the relationship between the Keatons and the children; (2) because the Keatons are a suitable placement, the court improperly found that a legally secure permanent placement could not be achieved without granting permanent custody to RCJFS; and (3) the court ignored R.C. 2151.412, which, according to appellant, "shows that a suitable relative, or interested individual, should be the presumptive placement for children before placing them in a permanent custody."
 {¶ 54} We conclude that the record contains substantial evidence to support the trial court's finding that granting RCJFS permanent custody, instead of granting the Keatons legal custody serves the children's best interests. First, while the children appear to share a loving relationship with the Keatons, the court found that placing them in their care would continue to expose them to the parents' potential problems and the conflict the mother creates. Thus, contrary to the father's argument, the court did in fact consider the children's relationship with the Keatons. Second, regarding the children's wishes, although neither child directly expressed his or her wishes, the guardian ad litem recommended that the trial court grant the Keatons legal custody. The court was not required, however, to follow the guardian ad litem's recommendation. See Baker v. Baker, Lucas App. No. L-03-1018, 2004-Ohio-469; In re Andrew B., Lucas App. No. L-01-1440, 2002-Ohio-3977.
 {¶ 55} Third, with respect to the children's custodial history, the evidence reveals that they have been removed from their mother's care, placed with the Keatons, reunification was attempted with the mother, and the children were removed from the Keatons' custody. The children have not been in a stable home environment since their 2002 removal. Absolutely no evidence exists that the father has ever taken charge of the children and cared for them, and he did not request the court to place the children in his care. Instead, he requested the court place them in the Keatons' care.
 {¶ 56} Fourth, the children need and deserve a stable environment. The Keatons' actions of returning the children to RCJFS show ambivalence on their part, which one can only guess whether it would repeat itself. Moving them in and out of the Keatons' home when the Keatons tire of "dealing with" the mother would not serve the children's best interests. The court implicitly determined that the Keatons were not a "suitable" relative placement, due to their ambivalence and the parents' potential to cause negative influences upon the children. The father's argument that the court was required to award the Keatons legal custody because they are an available relative placement is without merit. Thus, because the evidence supports the court's finding that the Keatons are not a suitable relative placement, the court did not improperly conclude that the children would lack a legally secure permanent placement without granting RCJFS permanent custody.
 {¶ 57} Although some factors support placing the children in the Keatons' legal custody, other factors show that awarding RCJFS permanent custody would better serve the children's best interests. Furthermore, courts have recognized that:
 {¶ 58} "`* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent or other relative] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"
 {¶ 59} In re Bishop (1987), 36 Ohio App.3d 123, 126,521 N.E.2d 838 (quoting In re East (1972), 32 Ohio Misc. 65, 69,288 N.E.2d 343, 346).
 {¶ 60} The father further complains that the trial court ignored R.C. 2151.412(G), which he claims requires a court to presume that placement with a relative is better than granting permanent custody to a children services agency.[4] We disagree.
 {¶ 61} In a dispositional hearing, a court considering a permanent custody motion possesses the discretion to award legal custody to either parent or to any other person who files a motion requesting legal custody. See R.C. 2151.353(A)(3); In reEvans (Feb 2, 2000), Summit App. No. 19489, unreported; In rePatterson (1999), 134 Ohio App.3d 119, 730 N.E.2d 439; In reBenavides (May 3, 2001), Cuyahoga App. No. 78204. We note that the statute does not require a juvenile court to consider relative placement before granting the motion for permanent custody. See In re Dyal (Aug. 9, 2001), Hocking App. No. 01CA11; In the Matter of Knight (Mar. 22, 2000), Lorain App. Nos. 98CA7258 and 98CA7266. In other words, a juvenile court need not find, by clear and convincing evidence, that a relative is an unsuitable placement option prior to granting the permanent custody request. Id. Relatives seeking the placement of the child are not afforded the same presumptive rights that a natural parent receives as a matter of law, and the willingness of a relative to care for the child does not alter the statutory factors to be considered in granting permanent custody. SeeDyal; In re Jefferson (Oct. 25, 2000), Summit App. Nos. 20092 and 20110; In re Davis (Oct. 12, 2000), Cuyahoga App. No. 77124. Rather, a juvenile court is vested with discretion to determine what placement option is in the child's best interest. See Dyal; Patterson; Benavides. The child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. In re Adoption ofRidenour (1991), 61 Ohio St.3d 319, 324, 574 N.E.2d 1055. Therefore, courts are not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. See In re Dyal,
Hocking App No. 01CA11, 2001-Ohio-2383; see, also, In re Lewis,
Athens App. No. 01CA20, 2001-Ohio-2618; In re Wilkenson, (Oct 12, 2001), Hamilton App. No. C-010402, C-010408; In re Knight
(March 22, 2000), Lorain App. Nos. 98CA72589, 98CA726698.
 {¶ 62} Further, a trial court's discretion with respect to child custody issues should generally be accorded the utmost respect, especially in view of the nature of the proceeding and the impact the court's determination will have on the parties' lives. See, e.g., Davis v. Flickinger (1997),77 Ohio St.3d 415, 674 N.E.2d 1159. Absent an abuse of discretion, a reviewing court should affirm a trial court's judgment. Thus, a reviewing court will not overturn a trial court's custody or placement decision unless the trial court has acted in a manner that can be characterized as arbitrary, unreasonable or capricious. See, generally, Blakemore v. Blakemore (1983), 5 Ohio St.3d 217,450 N.E.2d 1140. The underlying rationale of giving deference to the trial court's finding is based upon the premise that the trial court judge is best able view the witnesses and observe their demeanor, gestures, voice inflections, and to use those observations when weighing the testimony and evidence.
 {¶ 63} Additionally, some courts have recognized that R.C.2151.412(G) governs a court's review of a case plan, not its decision regarding a permanent custody motion. See In re KierraD., Lucas L-03-1164, 2004-Ohio-277; In re Harris (Nov. 2, 2000), Cuyahoga App. No. 76631. "Although R.C. 2151.412(G) and2151.414(D) provide guidelines for an agency to consider in placing a child, the statutes do not require the agency to award custody to a relative rather than to the agency." In re P.P.,
Montgomery App. No. 19582, 2003-Ohio-1051; In re Branstetter
(May 18, 2001), Montgomery App. No. 18539; In re Dixon (Nov. 29, 1991), Lucas App. No. L-91-021.
 {¶ 64} In the case at bar, the trial court was not required to consider placing the children with the Keatons before it could grant RCJFS permanent custody and the court did not abuse its discretion when it considered the children's best interests and determined that their best interests mandated a permanent custody award to RCJFS.
 {¶ 65} Accordingly, based upon the foregoing reasons, we overrule the father's second assignment of error.
 C {¶ 66} In his third assignment of error, the father contends that the trial court erred by determining that RCJFS used reasonable efforts to reunify the children with him and that reunifying with him within a reasonable time is not possible. He further complains that the court did not issue findings of fact under R.C. 2151.419(B)(1).
 {¶ 67} Children services agencies are statutorily required to develop case plans for children in their custody and the case plans should include objectives for each of the child's parents. See R.C. 2151.412. The trial court is required to determine whether the agency made reasonable efforts to return the child to the parents before it authorizes the removal of the child. See R.C. 2151.419; In re Leitwein, Hocking App. No. 03CA18, 2004-Ohio-1296; In re Wright, Ross App. No. 01CA2627, 2002-Ohio-410. In determining whether the agency made reasonable efforts to reunify the children with their parents, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute.In re Myers, Athens App. No. 02CA50, 2003-Ohio-2776 at ¶¶ 18;In re Bailey, Athens App. No. 04CA11, 2004-Ohio-3628.
 {¶ 68} "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." R.C.2151.419(A)(1). R.C. 2151.419(A)(2) further provides that if any of the following factors apply, "the court shall make a determination that the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home":
(a) The parent from whom the child was removed has been convicted of or pleaded guilty to [certain criminal offenses];
(b) The parent from whom the child was removed has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food. If the parent has withheld medical treatment in order to treat the physical or mental illness or defect of the child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body, the court or agency shall comply with the requirements of division (A)(1) of this section.
(c) The parent from whom the child was removed has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring such treatment of the parent.
(d) The parent from whom the child was removed has abandoned the child.
(e) The parent from whom the child was removed has had parental rights involuntarily terminated pursuant to section 2151.353,2151.414, or 2151.415 of the Revised Code with respect to a sibling of the child.
 {¶ 69} In addition to the statutory reasons why reasonable efforts may be unnecessary, courts have recognized an implied exception when case planning efforts would be futile. See, e.g.,In re Harmon (Sept. 25, 2000), Scioto App. No. 00CA2693; In reCrosten (Mar. 21, 1996), Athens App. No. 95CA1692. However, "trial courts should be cautious in finding that reasonable efforts would have been futile where an agency has chosen to ignore the natural parent." In re Efaw (Apr. 21, 1998), Athens App. No. 97CA49; see, also, In re T.K., Wayne App. No. 03CA6, 2003-Ohio-2634. When "an agency has chosen to ignore a natural parent, a finding of futility should be made only after careful consideration of how the agency's inaction contributes to the appearance of futility." In re Norris (Dec. 12, 2000), Athens App. Nos. 00CA38 and 00CA42.
 {¶ 70} In the case at bar, RCJFS did not know the father's whereabouts when it filed the permanent custody motion. He apparently moved to Florida and had spent some time in jail while the case was pending. His attorney entered an appearance early-on in the case and the father knew of the proceedings. He expressed knowledge of some of the case plan requirements, but he did not attempt to communicate with RCJFS. For a time, even his attorney could not reach him. Once he actually received the case plan, he did nothing to comply with it and he did not express a desire for the children to be reunified with him. The caseworker called the father, but apparently did not talk with him. We agree with RCJFS that the father's actions demonstrate a lack of commitment to the children and that his failure to communicate with them constitutes abandonment. RCJFS reasonably attempted to communicate with the father about the case plan, but for some reason, he did not communicate with them regarding the case plan and its requirements.
 {¶ 71} The father further complains that the trial court did not comply with R.C. 2151.419(B)(1), which requires the court to make "written findings of fact setting forth the reasons supporting its determination" that the agency either made a reasonable attempt to reunify the family or that the agency was not required to make such an effort." R.C. 2151.419(B) specifies that the court must briefly describe the services that the agency provided and why those services did not enable the child to return home.
 {¶ 72} This court has previously recognized, however, that the court's failure to make the R.C. 2151.419(B) findings may be harmless error if it is apparent from the record that the agency's used reasonable efforts and if the trial court's findings of fact clearly imply the reasonableness of the agency's efforts. See In re Holman (Dec. 1, 2000), Highland App. No. 99CA24 (citing In re Hulsey, fn 6, citing In re PieperChildren (1993), 85 Ohio App.3d 318, 326, 619 N.E.2d 1059; Civ.R. 61).
 {¶ 73} In the case sub judice, we believe that the record adequately shows that RCJFS used reasonable efforts and the trial court's factual findings clearly imply the reasonableness of RCJFS's efforts. RCJFS developed a case plan that included the father. It attempted to locate him and to communicate with him.
The father failed to communicate with RCJFS regarding the case plan.
 {¶ 74} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error.
 D {¶ 75} In his fourth assignment of error, the father argues that clear and convincing evidence does not support the trial court's factual finding that the Keatons "asked for [the children's] immediate removal due to not wanting to deal with the mother of the children." We do not agree.
 {¶ 76} RCJFS caseworker Babb's testimony fully supports the trial court's factual finding. She testified that the Keatons told her that they could not "deal with" the mother and that the Keatons relinquished custody to RCJFS.
 {¶ 77} Accordingly, based upon the foregoing reasons, we overrule the father's fourth assignment of error.
 III Case No. 04CA2788 {¶ 78} The mother's two assignments of error are interrelated and we will therefore address them together.
 {¶ 79} In her first assignment of error, the mother argues that the record does not contain sufficient evidence to support the trial court's decision. She contends that "the record is replete with instances of inconsistent testimony of the caseworker, challenging the testimony of the temporary custodians, and a recommendation of the guardian ad litem that the children be placed in relative placement."
 {¶ 80} In her second assignment of error, the mother asserts that the trial court's decision is not in the children's best interest. She contends that the evidence shows that placing the children in their paternal grandparents' custody is in their best interests.
 {¶ 81} The mother's first assignment of error basically challenges the credibility of the witnesses. As the trier of fact, the trial court had the benefit of observing the witnesses and weighing their testimony, and thus it was in the best position to weigh the credibility of their testimony and determine the facts of the case. See Stanley v. Stanley (Sept. 17, 2001), Mahoning App. No. 99 CA 203; Maccabee v. Maccabee (June 29, 1999), Franklin App. No. 98AP-1213.
 {¶ 82} Within her first assignment of error, she also contends that the trial court's judgment is not supported by competent evidence because the court failed to follow the guardian ad litem's recommendation. We disagree.
 {¶ 83} Again, we note that a trial court is not bound by a guardian ad litem's recommendation. See Baker v. Baker, Lucas App. No. L-03-1018, 2004-Ohio-469; In re Andrew B., Lucas App. No. L-01-1440, 2002-Ohio-3977; In re J.H., Summit App. No. 21575, 2003-Ohio-5611.
• "The function of a guardian ad litem or for a representative for the child is to secure for such child a proper defense or an adequate protection of its rights. The ultimate decision in any proceeding is for the judge and not for the representative of the parties and the trial court did not, for that reason, err in making an order contrary to the recommendation of the child's representative * * *."
 {¶ 84} In re Height (1975), 47 Ohio App.2d 203, 206,353 N.E.2d 887.
 {¶ 85} In the father's second assignment of error, we discussed the trial court's finding that placing the children in the Keatons' legal custody would not serve their best interests. For those same reasons, we overrule the mother's second assignment of error.
 {¶ 86} The mother additionally appears to challenge the trial court's finding that she did not attend the permanent custody hearing. The April 5, 2004 permanent custody hearing transcript shows that she did not attend the hearing. The magistrate stated: "Attorney Kathryn Janes is present representing the mother. Is your client present, Ms. Janes?" Janes responded, "No, your honor, she's not."
 {¶ 87} Accordingly, based upon the foregoing reasons, we overrule the mother's two assignments of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the judgment be affirmed and that appellee recover of the appellants the costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kline, P.J.: Concurs in Judgment Opinion as to Appellant Keaton's Assignments of Error I, III IV and Appellant Gowen's Assignments of Error I II; Concurs in Judgment Only as to Appellant Keaton's Assignment of Error II
Harsha, J.: Concurs in Judgment Opinion.
[1] Initially, Norman Leasure was thought to be Shane's biological father. Paternity tests subsequently determined that Tony Keaton is the biological father.
[2] A subsequent investigation could not substantiate the allegation.
[3] Some evidence exists that John Keaton is not Tony's father, as we discuss infra. Patricia Keaton is Tony's stepmother.
[4] The relevant provisions of R.C. 2151.412(G) provide:
In the agency's development of a case plan and the court's review of the case plan, the child's health and safety shall be the paramount concern. The agency and the court shall be guided by the following priorities: * * *
(2) If both parents of the child have abandoned the child, have relinquished custody of the child, have become incapable of supporting or caring for the child even with reasonable assistance, or have a detrimental effect on the health, and best interest of the child, the child should be placed in the legal custody of a suitable member of the child's extended family.