OPINION *Page 2 
{¶ 1} Appellants G.J. and S.M., the parents of L.M., appeal from a judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, that granted the permanent custody motion of appellee, Franklin County Children Services ("FCCS"). Because the evidence supports the trial court's judgment in awarding permanent custody to FCCS, and because no procedural error undermines the validity of that judgment, we affirm.
 {¶ 2} L.M. was born on October 16, 2003. Approximately three weeks later, FCCS removed the child from the home. On April 28, 2004, FCCS filed a complaint pursuant to R.C. 2151.04(C) requesting temporary custody of L.M. The trial court awarded temporary custody to FCCS, a public defender was appointed guardian ad litem for the child, and attorneys were appointed to represent father and mother.
 {¶ 3} On September 24, 2004, FCCS filed a motion for permanent custody of L.M. pursuant to R.C. 2151.414(B)(1), checking box to indicate filing under R.C. 2151.414(B)(1)(d). On November 3, 2005, FCCS filed an amended motion seeking custody pursuant to R.C. 2151.414(B)(1)(a) and (d). The trial court conducted a hearing on the motion that spanned three days. Following closing argument from counsel for G.J. and counsel for S.M., the court also heard from the guardian ad litem for each of the parents. Both guardians, as well as the guardian ad litem for the child, recommended that FCCS's motion be granted. On May 2, 2006, the trial court issued its final judgment, granting FCCS's motion for permanent custody. G.J. appeals, assigning two errors: *Page 3 
 [I.] The trial court erred by granting permanent custody of the minor child to the appellee when it had failed to comply with R.C. 2151.414.
 [II.] The trial court erred by finding that the child had been in the custody of the Appellee for 12 of 22 consecutive months prior to the filing of the motion for permanent custody.
S.M. appeals, assigning three errors:
 I. THE TRIAL COURT'S DECISION TERMINATING THE APPELLANT'S PARENTAL RIGHTS TO HER CHILD WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE.
 II. THE TRIAL COURT ERRED BY TERMINATING THE APPELLANT'S PARENTAL RIGHTS BECAUSE ALLOWING THE PROCEEDINGS TO CONTINUE WITHOUT THE PRESENCE OF THE APPELLANT'S GUARDIAN AD LITEM WAS PLAIN ERROR.
 III. THE TRIAL COURT ERRED BY TERMINATING THE APPELLANT'S PARENTAL RIGHTS WHEN THE APPELLANT DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE OHIO AND UNITED STATES CONSTITUTIONS.
I. G.J.'s First and Second Assignments of Error and S.M.'s FirstAssignment of Error {¶ 4} Because G.J.'s two assignments of error and S.M.'s first assignment of error raise similar issues, we address them jointly. Together they assert the evidence in the record does not support the trial court's conclusions under R.C. 2151.414(B)(1)(a) and (d) and further fails to support the trial court's conclusion that granting FCCS's motion for permanent custody is in the best interest of L.M.
 {¶ 5} As appellants correctly assert, the right to rear a child is a basic and essential civil right. In re Hayes (1997), 79 Ohio St.3d 46. A parent must be given every procedural and substantive protection the law allows prior to terminating that parent's *Page 4 
rights to the child. Id. Due process includes a hearing upon adequate notice, assistance of counsel, and under most circumstances, the right to be present at the hearing. In re Thompson (Apr. 26, 2001), Franklin App. No. 00AP-1358.
 {¶ 6} In order to terminate appellants' parental rights, FCCS was required to demonstrate by clear and convincing evidence that (1 ) one of the four factors enumerated in R.C. 2151.414(B)(1) applies; and (2) termination is in the child's best interests. In re Gomer, Wyandot App. No. 16-03-19, 2004-Ohio-1723. Clear and convincing evidence is the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. In re Abram, Franklin App. No. 04AP-220, 2004-Ohio-5435. It does not mean the evidence must be clear and unequivocal and does not require proof beyond a reasonable doubt. Id.
 {¶ 7} On appellate review, permanent custody motions supported by competent, credible, clear, and convincing evidence addressing all the essential elements of the case will not be reversed as against the manifest weight of the evidence. In re Nicholas H. (2000),137 Ohio App.3d 442; In re Poke, Lawrence App. No. 05CA15, 2005-Ohio-5226. Further, in determining whether a judgment is against the manifest weight of the evidence, the reviewing court is guided by the presumption that the findings of the trial court are correct. In re Brofford (1992),83 Ohio App.3d 869, citing Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Id. at 80; Abram, *Page 5 
supra. Here, competent, credible, clear, and convincing evidence supports the trial court's judgment awarding permanent custody of L.M. to FCCS.
 {¶ 8} R.C. 2151.414(B) provides that a court may grant permanent custody of a child to the movant if, as relevant here, "[t]he child is not abandoned or orphaned or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(B)(1)(a).
 {¶ 9} In determining whether a child cannot or should not be placed with either parent within a reasonable time, the court must consider all relevant evidence, including the factors listed in R.C. 2151.414(E)(1) through (16). R.C. 2151.414(E). If the court determines by clear and convincing evidence that one or more of the enumerated factors in R.C.2151.414(E)(1) through (16) exist, the court shall enter a finding that the child cannot or should not be placed with either parent. One factor alone will support a trial court's decision that the child cannot or should not be placed with either parent within a reasonable time period.In re Keaton, Ross App. No. 04CA2785, 2004-Ohio-6210, citing In reWilliam S. (1996), 75 Ohio St.3d 95.
 {¶ lO} R.C. 2151.414(E)(1) provides that "[f]ollowing the placement of a child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." R.C. 2151.414(E)(1). To determine "whether the parents have substantially *Page 6 
remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties." Id.
 {¶ 11} Father and mother are both moderately mentally retarded, each with an IQ in the mid-50s. According to father, he was employed with a friend laying carpet after being fired from a masonry company because of a fight with a female employee. Father testified he last worked in 2004. At the time of trial, he was receiving $603 per month in disability payments from Social Security. Father stated that in 2002, he was admitted to Twin Valley Psychiatric Hospital for two weeks with homicidal and suicidal tendencies, and he also was in Lima State Hospital in 1994 because of homicidal tendencies reflected in his pulling a knife on a woman he was dating.
 {¶ 12} Father's criminal history included a conviction in 1995 in Morrow County pursuant to a guilty plea to two counts of attempted rape and four counts of gross sexual imposition regarding the minor children of his sister with whom he lived for approximately three months. Pursuant to that plea and conviction, father was incarcerated for a period of time and subjected to a period of probation. Father eventually moved to Franklin County; he testified he began living with mother approximately three years prior to trial, or approximately February 2003.
 {¶ 13} Mother has three other children, though not with father. Two of the three lived with a grandfather at the time of trial, and the other lived with his father. She testified to no prior employment and stated she was not employed at the time of trial. Rather, she, *Page 7 
too, received $603 per month in disability payments from Social Security. She resided with father at the time of the trial, and they shared living expenses.
 {¶ 14} L.M. was removed from her parents' custody due to a "referral received regarding [L.M.], mom's ability to parent her, and the history of [L.M.'s] father." (Tr. Vol. II, 20.) A subsequent Safety Plan required that father would neither reside with the mother and L.M. nor have contact with the child. Apparently, a violation of the Safety Plan led to FCCS's efforts to obtain temporary custody of L.M. and to her placement with foster parents.
 {¶ 15} At or about the time of the referral, father's failure to register as a sex offender in Franklin County became known; he was charged with failure to register and was convicted. The Franklin County Common Pleas Court hearing his case imposed a period of probation and ordered him to be supervised on the sex offender case load. A condition of probation required father to abide by all rules and regulations of the probation department, one of which specified that he not associate with anyone under the age of 18 or be in the presence of anyone under the age 18 unless another responsible adult were present and aware of the defendant's offending behavior, with the supervising adult being approved by the probation department. No such supervised contact has been approved other than father's visitation with L.M. under the supervision of the FCCS staff or its designees.
 {¶ 16} A case plan was set up for potential reunification, but FCCS recognized a severe impediment to reunification: father's and mother's continued commitment to living together precluded reunification with the child due to father's criminal history and resulting conditions of probation. Apparently set up in the event the living arrangements of father *Page 8 
and mother were modified, a case plan prescribed that mother complete parenting classes at MRDD. Mother did so, but an FCCS caseworker testified to some concern about mother's parenting skills during visits with L.M., as mother tended to sit in a chair, limiting her ability to interact with the child. FCCS discussed the matter with mother in terms of a safety factor, but mother did not show consistent improvement. Rather, father tended to dominate interaction with L.M. during the weekly visitation.
 {¶ 17} Mother also completed a psychological evaluation pursuant to the case plan; it resulted in no additional recommendations for her. Although mother was referred to MRDD case management services, she refused those services. As part of the case plan, the caseworker discussed with mother the possibility of living apart from the father; the caseworker explained the concern about mother's living with father, as well as concerns not only about mother's ability to protect her child from father, but also her ability to maintain housing and utilities should she live apart from him. In the caseworker's view, mother did not complete the case plan because she did not demonstrate parenting skills or an ability to protect L.M. from the child's father.
 {¶ 18} The record supports FCCS's concern about mother's ability to protect L.M. from father. According to the evidence, in late summer 2005, father's probation officer, in a routine field visit, encountered father with mother in lawn chairs around a small swimming pool that had been set up in the yard; two small children were in the pool. Both adults were in swim suits, and father was "wet from head to toe." (Tr. 21.) Father's probation was not revoked as a result of the incident, but he received some treatment sanctions, including additional sex offender therapy and a day reporting program. *Page 9 
 {¶ 19} Mother, who was not approved to supervise father with the children, did not appear to think the situation was serious, despite the absence of an approved supervising adult. Indeed, mother testified that if she were to receive custody of L.M., she would continue to live with father, as she had no concern about father's being around L.M. and saw nothing wrong with the association. Observing that mother did not seem to take probation seriously, the probation officer testified father had been abusive in his relationship with the mother, and mother thus may have reason not to report father's deviant behavior with L.M. or other children, were it to occur.
 {¶ 20} According to the case plan, father was to complete parenting classes. Although he did so, his visits with the child did not seem to integrate the skills he learned from the classes. He interacted with the child more than mother did by playing with L.M. and helping her dress, but he tended to be rough in his play. For example, L.M. did not like to be picked up and raised over father's head, but father routinely did so, causing negative reactions from L.M.
 {¶ 21} Pursuant to the case plan, father completed a psychological evaluation, resulting in a recommendation that he engage in MRDD case management services; father said he did not need them. Although he did not complete an updated drug and alcohol assessment, the one done in 2004 for his probation officer satisfied the case plan. In addition, the caseworker indicated that at the time of trial father should have been nearing completion of his anger management classes. The caseworker nonetheless testified father had not successfully completed his entire case plan because he did not follow the recommendations from the psychological exam, and he required some additional work on his parenting skills. The caseworker, however, admitted that other than *Page 10 
completing probation requirements and case management services, father met the case plan.
 {¶ 22} During father's and mother's visitation with L.M., L.M. tended to play by herself and separated easily when the time came for her to return to her foster parents. She displayed no significant bond with mother and rarely went toward mother during the visitations unless someone placed her there. She demonstrated no significant attachment to father and usually did not go to him unless led to him. By contrast, she was very happy to see her foster parents when she arrived home, and she hugged her foster siblings.
 {¶ 23} Although L.M. was two and one-half years old at the time of trial, she could only say a few words, such as "momma," "dada," and "ball," usually at the foster parents' home. Even though L.M. was developmentally delayed, she was more verbal, more active, and more communicative with her foster family. She was bonded with them, and, because L.M. is developmentally delayed, they had her attending speech therapy, occupational therapy, and physical therapy. According to the caseworker, L.M. needed a permanent placement, no relatives were available, and the foster parents were potential adoptive parents.
 {¶ 24} Despite the progress mother and father have made toward completion of the case plan, a major hurdle remained in terms of reuniting mother and father with the child, a problem the case plan did not alleviate: father is not permitted to live in the same residence with mother and child, and he is not permitted contact with the child absent supervision under an authority the probation office approves. Mother testified that she would not leave father, and the evidence raises substantial concern about her ability to *Page 11 
live apart from him if she did leave, not only in terms of parenting L.M., but also in maintaining housing and utilities on her limited income.
 {¶ 25} Recognizing that his residing with mother prevented her keeping L.M., father testified he asked the probation officer to transfer him to Morrow County. The probation office refused because father was generally compliant here, reporting a period of sobriety that perhaps was the longest in his life. He also received multiple county services as a resident of Franklin County, including housing assistance and mental health counseling. Moreover, the probation officer noted that although the sex offense for which he was convicted occurred in Morrow County, the offense for which he was on probation at the time of trial was his failure to register in Franklin County. Despite his request for a transfer, father several times explained that he did not wish to be separated from mother and would like contact with L.M.
 {¶ 26} In the final analysis, due to father's probation conditions and the refusal of mother and father to live apart, the child may not be reunited with them. Accordingly, the court's order is supported under R.C. 2151.414(E)(1).
 {¶ 27} Father also contests the trial court's finding that the child was in the custody of FCCS for 12 of 22 consecutive months prior to the filing of FCCS's motion for permanent custody. Without question, at the time the original motion for permanent custody was filed, FCCS's custody of the child did not meet the requirements of R.C. 2151.414(B)(1)(d). At the time the amended motion was filed, the motion complied with R.C.2151.414(B)(1)(d). Because, however, the trial court's judgment is supported under R.C. 2151.414(B)(1)(a), we need not determine whether the trial court's reliance on R.C. 2151.414(B)(1)(d) is proper by virtue of the amended motion. Rather, because clear and *Page 12 
convincing evidence supports the trial court's conclusion that the child could not be reunited with the parents, the trial court was correct in reviewing the factors under R.C. 2151.414(D) to determine the best interest of the child.
 {¶ 28} In that regard, the testimony establishes that the interaction and interrelationship of the child with the child's parents was minimal, no significant bond being demonstrated. Although both parents completed parenting classes, their interaction with the child failed to integrate what they learned into their play with her. Mother waited for the child to come to her and preferred to remain seated. While father was more interactive, he frequently provoked the child to frustration by insisting on playing with her in ways she found disagreeable. At times, the child attempted to put on her coat and hat before the visitation period expired in an effort to leave. On her return to her foster parents, she greeted them with smiles and with hugs for her foster siblings. She was more talkative and active with her foster parents and clearly bonded with them. R.C. 2151.414(D)(1). While the child was too young to express her wishes, the guardian ad litem for the child recommended that the motion for permanent custody be granted. Indeed, each parent had a guardian ad litem for purposes of the permanent custody hearing, and both guardians ad litem recommended that the motion be granted. R.C. 2151.414(D)(2).
 {¶ 29} Under R.C. 2151.414(D)(3), the child was in the temporary custody of FCCS for 12 or more months of a consecutive 22-month period from the point the amended motion for permanent custody was filed. Finally, under R.C. 2151.414(D)(4), the evidence demonstrates the child needed a legally secure placement that could not be *Page 13 
achieved without a grant of permanent custody. The foster parents, with whom L.M. was bonded, were a potential adoptive home.
 {¶ 30} Because clear and convincing evidence also supports the trial court's determination of the best interests of the child, father's assignments of error are overruled and mother's first assignment of error is overruled.
II. Mother's Second and Third Assignments of Error {¶ 31} Mother's second assignment of error contends the trial court erred in adjudicating the matter in the absence of her guardian ad litem. On the third day of trial, the court noted that though the matter was set to resume at 1:30 in the afternoon, at 2:08 p.m., the attorney serving as mother's guardian ad litem was not present. The court inquired whether anyone objected to continuing in his absence. Hearing no objections, the court proceeded. Direct examination of Jennifer Klaiber, a Social Service Aid for FCCS, began with a discussion of her role as a supervisor for L.M.'s visitations with her parents. She described the interaction of the mother and father with the child and also the child's interaction with the foster parents. Five pages into her examination, mother's guardian ad litem appeared in the courtroom.
 {¶ 32} In reviewing the assigned error, we note that at all times mother was represented by counsel. Moreover, no one, including mother's counsel, objected to proceeding in the absence of the guardian ad litem for mother. Thus, we are to determine whether plain error occurred. Insofar as the trial is concerned, mother's attorney protected mother's rights during trial and thus arguably provided a more necessary service than those the guardian ad litem might render during the course of the trial. More important, much of the testimony the guardian ad litem missed duplicated the testimony of the *Page 14 
caseworker whose testimony the guardian ad litem observed. Accordingly, whether we apply the criminal or civil standard for plain error, this record does not support mother's contentions. See, e.g., Goldfuss v.Davidson (1997), 79 Ohio St.3d 116, syllabus; State v. Long (1978), 53 Ohio St.2d 91. Mother's second assignment of error is overruled.
 {¶ 33} Mother's third assignment of error contends she was denied effective assistance of counsel when counsel failed to object to proceeding in the absence of her guardian ad litem. To establish her contentions, mother must demonstrate her trial counsel's performance was deficient, and she was prejudiced as a result of that deficient performance. Here, we need not determine whether counsel's performance was deficient because mother cannot establish prejudice. The guardian ad litem was absent for a very short period of time, and the testimony rendered during his absence largely duplicated the caseworker's earlier testimony. Accordingly, mother's third assignment of error is overruled.
 {¶ 34} Having overruled all of the assignments of error, we affirm the judgment of the trial court.
 Judgment affirmed. FRENCH and McGRATH, JJ., concur. *Page 1