DECISION AND JUDGMENT ENTRY
{¶ 1} Robert Perry ("Father") and Bridget Prater ("Mother") separately appeal the Vinton County Court of Common Pleas, Juvenile Division, adjudication granting permanent custody of their son, Ethen Perry, to the Vinton County Department of Job and Family Services ("VCDJFS").[1] Father contends that the trial court erred in relying upon R.C. 2151.414(B)(1)(d) as the basis for terminating his parental rights when VCDJFS knew Father's identity yet failed to include him in the case plan. Additionally, he asserts that the trial court erred by failing to require VCDJFS to exercise reasonable efforts to reunify him with Ethen. Because we find that the record contains some competent credible evidence demonstrating that: (1) Father abandoned Ethen; (2) R.C. 2151.419(A)(2)(d), obligated the court to find that the agency was excused from exercising reasonable efforts to reunite Father with Ethen; and (3) the agency's failure to include Father in the case plan did not substantially contribute to the Father's abandonment of Ethen, we disagree. Accordingly, we overrule each of Father's assignments of error and affirm the trial court's judgment terminating Father's parental rights and granting permanent custody to VCDJFS.
 {¶ 2} In her sole assignment of error, Mother contends that the trial court abused its discretion by denying her motion to grant legal custody of Ethen to her parents. Specifically, Mother contends that the trial court acted arbitrarily and unreasonably when it determined that a grant of permanent custody to VCDJFS was in Ethen's best interest when it ignored certain evidence regarding her parents' interactions with Ethen, their efforts to obtain Ethen's placement in their home, and their ability to provide a legally secure permanent placement for Ethen. Because we find that some competent credible evidence supports the trial court's determination that the grant of permanent custody to VCDJFS is in Ethen's best interest, we disagree. Accordingly, we overrule Mother's sole assignment of error and affirm the trial court's judgment terminating Mother's parental rights and granting permanent custody to VCDJFS.
 I. {¶ 3} Bridget Prater ("Mother"), an unmarried woman, gave birth to Ethen on June 15, 2004. The next day, VCDJFS filed a complaint alleging that "Baby Boy Prater," now known as Ethen Paul Perry, was a neglected, abused and dependent child because he tested positive for cocaine shortly after his birth. VCDJFS also simultaneously filed an ex parte motion for temporary custody of Ethen, which the trial court granted on June 16, 2004. Thereafter, the trial court conducted a pretrial/shelter care/adjudication/dispositional hearing. At the hearing, Mother admitted the allegations of abuse and dependency, and the state dismissed the charge of neglect. The court proceeded to find Ethen abused and dependent, and placed him in the temporary custody of VCDJFS for placement in foster care. The court also ordered Mother to attend outpatient counseling from Health Recovery Systems ("HRS") while attempting to arrange inpatient counseling, and ordered all visitation to be supervised.
 {¶ 4} VCDJFS filed the initial case plan on July 16, 2004. At that time, the agency sought to reunify Ethen with Mother. The case plan enumerated a number of goals for Mother, including attending an assessment for substance abuse counseling, contacting inpatient treatment facilities for an assessment for inpatient substance abuse treatment, following any recommendations arising from the assessments, remaining free of substances of abuse, and taking random drug screens.
 {¶ 5} The initial case plan provided for Ethen's placement with his maternal grandparents, Bruce and Brenda Prater,[2]
and provided that Mother could visit Ethen at their home as long as she cooperated with household and agency rules. The case plan specified that Mother could not take Ethen from the Praters' home unsupervised. Notably, the initial case plan did not mention Father, let alone set forth any goals or services designed to reunite Father with Ethen.
 {¶ 6} The trial court issued an entry on July 22, 2004, noting the filing of the case plan and granting "parties and counsel" seven days from receipt of the entry and case plan to file objections and/or request a hearing regarding the case plan. The record reflects that the clerk served a copy of the case plan upon Mother by ordinary mail on July 22, 2004. The court issued an entry approving the case plan on August 11, 2004.
 {¶ 7} VCDFJS initially placed Ethen with the Praters on June 20, 2004 in accordance with the initial case plan. However, at their request, the agency removed Ethen from their home and placed him with Mother's sister, Essalona Dawn Keller, on July 15, 2004. Then, on July 22, 2004, the agency removed Ethen from Keller's care and placed him with Pam East, a certified foster parent. Ethen has remained in East's care since that time.
 {¶ 8} On July 29, 2004, the Praters filed a motion to intervene as parties in an effort to regain Ethen's placement in their home. VCDJFS opposed the motion noting that the court's consideration of relatives for the appointment of a temporary custodian did not make the relatives parties to the case. The court agreed with the agency and denied the Praters' motion on August 16, 2004.
 {¶ 9} On February 1, 2005, VCDJFS filed an amended case plan cover sheet, modifying the visitation provisions of the case plan to reflect that visitation would now consist of day long visits at the Praters' home, twice per week. It further specified that Brenda would be responsible for picking Ethen up from and returning him to daycare. The court approved this amendment by an entry filed on February 8, 2005. Then, on February 18, 2005, the agency filed another amended case plan cover sheet, modifying the visitation provisions of the case plan to cancel unsupervised visits between Ethen and the Praters because Ethen's best interests now required the visits to be supervised at the agency. The court approved the amendment by an entry filed on March 15, 2005.
 {¶ 10} In May 2005, VCDJFS moved the court to continue the dispositional order of temporary custody to the agency beyond the one year anniversary date of Ethen's placement. In light of the fact that Mother had not met any of the case plan goals, the agency did not believe that reunification was likely.
 {¶ 11} On May 31, 2005, Mother filed motions requesting: (1) the continuance of the annual review hearing scheduled for June 13, 2005, because of her incarceration in Ross County and her previously scheduled criminal jury trial; (2) the amendment of the case plan to permit her to exercise supervised visitation in her parents' home; and (3) the grant of legal custody to her parents.
 {¶ 12} On June 27, 2005, VCDJFS filed a motion for permanent custody in which it alleged that: (1) the agency had temporary custody of Ethen for more than twelve months of a consecutive twenty-two month period; (2) Ethen cannot be placed with either parent within a reasonable time or should not be placed with either parent; and (3) an award of permanent custody to the agency is in Ethen's best interests.
 {¶ 13} Regarding its allegation that Ethen cannot be placed with either parent within a reasonable time or should not be placed with either parent, the agency alleged that, despite reasonable case planning and diligent efforts, the parents failed continuously and repeatedly to remedy the problems that initially caused the child to be placed outside of the home. Specifically, the agency noted Mother's continued illegal use of controlled substances and her failure to participate in substance abuse treatment, and Father's refusal to participate in the case "in any manner whatsoever." The agency alleged that Mother's chemical dependency is so severe that it makes her unable to provide Ethen with a permanent home within a reasonable time.
 {¶ 14} The agency also maintained that both parents demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with Ethen when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for him. The agency noted Mother's failure to provide any support for Ethen, her failure to regularly visit or communicate with Ethen, and her refusal to participate in substance abuse treatment. Additionally, the agency alleged that: "The putative father has not supported, visited, or communicated with Ethen at all. His complete lack of participation in this case shows an unwillingness to provide an adequate permanent home for Ethen."
 {¶ 15} The record reflects that the trial court issued a summons on permanent custody to both Father and Mother on August 3, 2005, and that the summonses were personally served upon each of them on August 11, 2005.
 {¶ 16} On August 29, 2005, the Vinton County Court of Common Pleas terminated Mother's community control for a previous conviction and reimposed a twelve-month prison term.
 {¶ 17} In late September 2005, the guardian ad litem filed a report detailing her investigation and finding that an award of permanent custody to VCDJFS is in Ethen's best interest. The guardian specifically noted that: (1) the parents failed to make any sustained efforts to remedy the problems that caused Ethen's removal; (2) Ethen has been in the custody of VCDJFS his entire life; (3) Ethen has a strong bond with his foster care provider and she has provided him appropriate and loving care; (4) Mother consistently placed her own addiction and selfish interests ahead of Ethen's best interest and failed to make more than a scintilla of effort to turn her life around in order to parent Ethen.
 {¶ 18} The trial court issued a journal entry on September 30, 2005, finding that VCDJFS used reasonable efforts to meet the goal of reunifying Ethen with Mother and otherwise prevent an out of home placement. The court based its finding upon the case plan services offered to Mother, and upon the fact that the agency attempted relative placement early in the proceedings.
 {¶ 19} On November 9, 2005, Father filed a handwritten letter stating that he was in SEPTA in Nelsonville, Ohio. The trial court interpreted Father's communication as a request for the appointment of counsel, and appointed counsel to represent him in the proceedings. Additionally, on November 14, 2005, Mother entered a guilty plea to one charge of Driving Under the Influence of Alcohol or Drugs, in violation of R.C.4511.19(A)(1)(a)/4511.19(G)(1)(d), a felony of the fourth degree, and received a six month prison sentence to be served concurrently with her previously reimposed sentence in a separate case.
 {¶ 20} The court scheduled a hearing upon all pending issues. However, upon request of the parties, the court converted the hearing to a settlement negotiation. When negotiations proved unsuccessful, the court rescheduled the hearing and indicated that it would not grant any further continuances.
 {¶ 21} The trial court conducted a hearing upon all pending motions on January 13, 2006. At that hearing, the court heard the testimony of: (1) Stacy Lynn Staten, Mother's parole officer; (2) Pamela East, Ethen's foster care provider; (3) Bonnie Mugrage, a chemical dependency counselor for HRS; (4) Sara Zinn, a supervisor for VCDJFS; (5) Father; (6) Jody Walker, the Director of VCDJFS; (7) Massina Poe, a former employee of Angel Babies Day Care; (8) Marla Remy, the mother of a child who attended daycare with Ethen; (9) Brenda Prater; (10) Barbara Brown, Brenda's sister; and (11) Cory Clevenger, Brenda's son.
 {¶ 22} On June 1, 2006, the trial court issued an entry terminating both Mother and Father's parental rights and awarding VCDJFS permanent custody of Ethen. In support of its order, the trial court found that Mother gave birth to Ethen on June 15, 2004, and that he tested positive for marijuana and cocaine at birth. The court granted VCDJFS temporary custody of Ethen on June 16, 2004, and that he remained in the agency's temporary custody continuously after that date, a period of more than 18 months. At the August 23, 2004 pre-trial/adjudicatory/dispositional hearing, Mother admitted Ethen was a dependent and abused child.
 {¶ 23} With regard to Father, the trial court found that he had contact with Ethen during the first four weeks of Ethen's life at the Praters' home, and that since that time, he has only seen Ethen four times. Father did not see Ethen for at least a full year and he did not file a motion for permanent custody until he made an oral motion at the January 2006 hearing. The court found that Father thought Mother was going to get custody. Although the agency offered Father his own visitation, he never really looked into it. Father understood his rights and obligations as Ethen's Father. Brenda Prater, Corey Clevenger and Marla Remy testified that Father's limited interactions with Ethen were appropriate — he played with, held, fed, and changed Ethen and gave the child toys. Pam East, Ethen's foster mother, also had a favorable impression of Father. However, Father did not know Ethen's favorite food, color, or bedtime story. Father never paid or contributed to Ethen's support and declined to participate in a case plan. Further, at the time Father entered SEPTA for a cocaine possession conviction in August 2005, he had not seen Ethen for seven months. Father acknowledged that he had a serious drug problem before he entered SEPTA, and that cocaine was his drug of choice.
 {¶ 24} The trial court also found that since Father entered SEPTA, he has tested negative for drugs. He has a job at Superior Hardwoods, and intends to obtain a drivers license at the expiration of his current suspension. After his release from SEPTA, Father intends to live with his parents. Although Father testified his parents and other relatives were willing to assist him in providing for Ethen's care, he presented no evidence from those relatives indicating that they wished to care for Ethen. Father has two other children, by two different mothers, neither of whom reside with him. Father presented no evidence that either of his other children had met Ethen.
 {¶ 25} The court found that Mother sporadically exercised visitation with Ethen. She missed so many visits that East no longer took Ethen to the agency until Mother actually appeared for her visit. Additionally, the court noted Mother had not seen Ethen since August 2005, due to her incarceration.
 {¶ 26} The court found that Mother has long-term, substantial substance abuse problems and used cocaine and marijuana while pregnant with Ethen. She has not accepted treatment alternatives available to her, including: outpatient treatment that Brenda Prater facilitated while Mother lived with her parents; a substance abuse counseling and treatment referral made by the Community Corrections Department as a result of a misdemeanor traffic case; inpatient and halfway house treatment ordered as the result of a cocaine possession conviction; and both inpatient and outpatient services that VCDJFS attempted to facilitate for her. The court noted that Mother attended one appointment at HRS, but cancelled three appointments and no-showed once. Additionally, she failed to comply with the admissions procedures for the Rural Women's Recovery Program and the Spencer House Program by failing to provide them with necessary paperwork, such as a copy of TB test results, and therefore failed to enter those programs. Mother did have regular contact with her parole officer and cooperated with drug testing related to her parole, even admitting that she would probably fail such tests. The court specifically found that VCDJFS offered Mother appropriate case plan services to address her substance abuse, but that she declined those services.
 {¶ 27} The court also found that Mother was in and out of her parents' care as a child. She spent time in foster care in 1995 and returned to her parents' home in early 1996, only to be placed in the temporary custody of her grandmother later that year. Mother returned to her parents' home again, only to be placed with Milestones Crisis/Respite Emergency Bed program in January 1998. In June of 1998, she went to stay with her sister, Dawn.
 {¶ 28} Mother presented no evidence whatsoever regarding her position on a grant of permanent custody to the agency versus a grant of relative placement/custody to her parents. Without determining fault, the court found that the Praters could not provide a legally secure placement for Mother when she was a child, and chose not to provide a secure placement for Ethen after the first four weeks of his life. The Praters visited with Ethen in the fall of 2004, and in January 2005, VCDJFS expanded their visitation, with the hope that further expansion would lead to placement of Ethen in their home once again. However, the court found that the Praters created a scene during a visit at the agency in February 2005. The court noted that the evidence regarding this incident conflicted, with some testimony describing it as no big deal, or a little temper tantrum at best, or scary and threatening at worst. As a result, the expanded visits did not occur, and the Praters made no inquiries about any more visits after this incident. The court noted that "[T]he Praters h[a]ve not visited with Ethen for close to a year now, since the February, 2005, `tantrum' at VCDJFS."
 {¶ 29} The court noted that the agency placed Ethen with the Praters on June 20, 2004, with Esslona Dawn Keller on July 15, 2004, and with East on July 22, 2004. The court found that East loves Ethen, and that she is essentially the only parent Ethen has known. She incorporated him into her family, which includes four grown daughters and six grandchildren, and Ethen has bonded with the family. While East works at Zaleski Elementary School, and attends night school twice per week, her daughter provides Ethen's care during those times. She knows of and has continuously cared for Ethen's medical needs, including his asthma, ear infections, colds, pneumonia, and the tubes in his ears. The court found that East has provided Ethen with "excellent care," and that East has expressed interest in adopting Ethen.
 {¶ 30} The trial court addressed each of the best interest factors enumerated in R.C. 2151.414(D) in its decision. In considering Ethen's relationship with the people in his life pursuant to R.C. 2151.414(D)(1), the court found that the parents' interaction with Ethen had been minimal at best. The court noted that Father had not been in contact with Ethen for over a year. Although the agency provided Father with opportunities to have more visitations, and to have visitation on his own, he did not avail himself of those opportunities. Father's own testimony supported these findings. The court again noted that when Mother was not in prison, her visits were so sporadic that the agency instructed East not to bring Ethen to the agency for visitation until Mother actually arrived at the agency. Additionally, the court found that Mother's dependency on drugs and alcohol pushed her relationship with Ethen to the background.
 {¶ 31} The court noted that the Praters received the first chance to care for Ethen when the agency placed him in their home from June 20 to July 15, 2004, but that they "gave up on the placement" when they asked VCDJFS to remove him from their home. Additionally, the court found that the Praters did not visit with Ethen after Bruce's "tantrum" at the agency in February 2005.
 {¶ 32} With regard to Ethen's relationship with East, the court noted that East has provided him with "excellent, consistent and loving care[,]" and attended to his medical needs. Further, the court found that East and her extended family have a strong bond with Ethen, and that Ethen is psychologically and emotionally dependent upon East.
 {¶ 33} Pursuant to R.C. 2151.414(D)(2), the court found that due to his tender age, Ethen cannot verbally express his wishes. However, the court noted that East's home is the only home he has ever known, having lived there since he was four or five weeks old.
 {¶ 34} The court considered Ethen's custodial history pursuant to R.C. 2151.414(D)(3), and found that Ethen has been in the custody of VCDJFS for more than twelve months of a consecutive twenty-two month period. Moreover, the court noted that when VCDJFS placed Ethen with his relatives, he had three placement changes during the first four to five weeks of his life. With regard to R.C. 2151.414(D)(4), the court found that neither Mother nor Father could provide Ethen with a legally secure placement. The court stated that the Praters elected not to provide Ethen with a legally secure placement early in his life, and were unable to provide such a placement for Mother when she was a child. In contrast, the court found that VCDJFS could provide Ethen with a legally secure placement by facilitating his adoption by East. Additionally, in considering the factors enumerated in R.C. 2151.414(E)(7)-(11), the court found that Father abandoned Ethen before entering SEPTA.
 {¶ 35} The trial court concluded, in relevant part, that: (1) VCDJFS established by clear and convincing evidence that Ethen has been in its temporary custody for more than twelve months of a consecutive twenty-two month period of time; (2) Father abandoned Ethen; (3) the court is not required to consider relative placement prior to granting a motion for permanent custody; (4) an award of permanent custody to VCDJFS is in Ethen's best interest. Accordingly, the court granted VCDJFS's motion for permanent custody and denied all other pending motions.
 {¶ 36} Father now appeals in Case No. 06CA649, raising the following assignments of error: I. "THE TRIAL COURT ERRED IN RELYING SOLELY ON O.R.C. 2151.414(B)(1)(D) IN TERMINATING PARENTAL RIGHTS WHEN NATURAL FATHER WAS KNOWN TO THE CHILDRENS (sic) SERVICES AGENCY BUT WAS NOT PUT ON THE CASE PLAN." II. "THE TRIAL COURT ERRED IN NOT REQUIRING VINTON COUNTY JOB AND FAMILY SERVICES TO USE REASONABLE EFFORTS TO REUNIFY ETHEN PERRY WITH HIS FATHER."
 {¶ 37} Mother also appeals in Case No. 06CA648, raising the following assignment of error: "THE TRIAL COURT ERRED WHEN IT DENIED BRIDGET PRATER'S MOTION FOR LEGAL CUSTODY TO BE PLACED WITH BRUCE AND BRENDA PRATER."
 II. {¶ 38} In his first assignment of error, Father contends that the trial court erred in relying upon R.C. 2151.414(B)(1)(d) to award permanent custody to VCDJFS. Specifically, Father contends that the trial court should not rely upon that section of the code as a basis for terminating a parents rights, circumventing the need for a parental fitness analysis, where a children's services agency knows the identity of the child's father, yet fails to include him in the case plan or offer him services to facilitate reunification. In his second assignment of error, Father contends that the trial court erred by failing to require VCDJFS to exercise reasonable efforts to reunify Ethen with him. Because both of Father's assignments of error concern the agency's failure to include Father in the case plan, we address them together.
 {¶ 39} An agency seeking permanent custody bears the burden of proving its case by clear and convincing evidence. In reSchmidt (1986), 25 Ohio St.3d 331, 335; R.C. 2151.414(B)(1). The Ohio Supreme Court has defined "clear and convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." In re Estate ofHaynes (1986), 25 Ohio St.3d 101, 103-04.
 {¶ 40} We will not reverse the judgment of the trial court if there is some competent, credible evidence going to all the essential elements of the case. State v. Schiebel (1990),55 Ohio St.3d 71, 74. We give the trial court's final determination "the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." In re Alfrey, Montgomery App. No. 01CA0083, 2003-Ohio-608, at 102, citing Miller v. Miller (1988),37 Ohio St.3d 71, 74.
 {¶ 41} A parent has a "fundamental liberty interest in the care, custody, and management of his or her child." Santosky v.Kramer (1982), 455 U.S. 745, 753. The Ohio Supreme Court has noted that "[p]ermanent termination of parental rights has been described as `the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents `must be afforded every procedural and substantive protection the law allows.'" In reHayes (1997), 79 Ohio St. 3d 46, 48, quoting In re Smith
(1991), 77 Ohio App.3d 1, 16.
 {¶ 42} R.C. 2151.414 governs the termination of parental rights. R.C. 2151.414(B)(1) requires a trial court to conduct a two-pronged analysis to determine whether to grant permanent custody of a child to a children services agency. In that analysis, the court must first determine by clear and convincing evidence that any one of the factors enumerated in R.C.2151.414(B)(1)(a)-(d) exists. Those factors include: "(a) * * * [T]he child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents. (b) The child is abandoned. (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody. (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999." R.C. 2151.414(B)(1)(a)-(d).
 {¶ 43} Then the court must determine by clear and convincing evidence that an award of permanent custody to the agency is in the child's best interest. R.C. 2151.414(D) requires a trial court to consider certain factors in determining whether a child's best interests would be served by granting a motion for permanent custody. Those factors include: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.
 {¶ 44} Moreover, "R.C. 2151.419(A) directs the trial court at any hearing where the child is committed to the permanent custody of an agency to determine whether the agency has made reasonable efforts to return the child home." In re Efaw (Apr. 21, 1998), Athens App. 97CA49. However, the statute further requires a trial court to make a determination that the agency is not required to make reasonable efforts under certain circumstances, one of those circumstances being that the parent has abandoned the child. R.C.2151.419(A)(2)(d). "For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C.2151.011(C).
 {¶ 45} Here, Father does not dispute the trial court's finding that Ethen had been in the temporary custody of VCDFJS for more than twelve months of a consecutive twenty-two month period. However, he contends that the purpose of the "twelve of twenty-two" provision is to afford the parents a full twelve month period to work toward reunification. Therefore, he maintains that the court should not permit the agency to invoke the "twelve of twenty-two" presumption of parental unsuitability when the agency failed to include him in the case plan and afford him an opportunity to work toward reunification immediately upon learning that he was Ethen's father. Father argues that the record demonstrates "no efforts by anyone to attempt to aid [him] in the return of his child."
 {¶ 46} Father fails to acknowledge the trial court's explicit finding that he abandoned Ethen. Because the trial court found that Father abandoned Ethen, the trial court did not rely solely upon R.C. 2151.414(B)(1)(d) to terminate Father's parental rights, as Father claims, but also relied upon R.C.2151.414(B)(1)(b). Moreover, because the court found that Father abandoned Ethen, R.C. 2151.419(A)(2)(d) obligated the court to find that the agency did not have to make reasonable efforts with regard to Father.
 {¶ 47} Assuming, in the interest of justice, that Father's first assignment of error broadly includes the argument that the trial court erred in terminating his parental rights where the agency failed to include him in the case plan, we conclude it is without merit.
 {¶ 48} Father argues that Garabrandt v. Lucas Cty. ChildrenSvcs. Bd. (1988), 47 Ohio App.3d 119, supports his contention that a parent who is known to the agency must be included in the case plan. The Garabrandt court found that the biological father knew that the agency had been involved with the children since their birth and, even when the agency obtained temporary emergency custody of the children he failed to "come forward and identify himself as their father and request that he be reunited with his children." Id at. 120. The court held that "where an unidentified biological parent does not voluntarily step forward and identify himself as the parent of abused, neglected or dependent children and request that he be reunited with the children, such a parent is not denied due process of law when he is not provided with a [comprehensive reunification plan] pursuant to R.C. 2151.412 prior to the court's divesting him of his parental rights." Id. at 121.
 {¶ 49} Because the true biological father's identity did not become known to the agency until "just weeks before the court granted permanent custody to [the agency,]" the Garabrandt
court required the agency to include the biological father "as a party to the permanent custody proceedings," but the court did not require his inclusion in the comprehensive case plan. Id. at 120-121. Thus, the holding in Garabrandt does not support father's argument. Moreover, we note that even if theGarabrandt court did find that R.C. 2151.412 required the agency to include the biological father in the case plan once it identified him, the 1989 amendments to R.C. 2151, and specifically R.C. 2151.412, eliminated the language mandating that children services agencies develop and implement "initial" and "comprehensive" reunification plans. Instead, the amendments replaced the statutory requirement of a comprehensive reunification plan with a duty on the part of children services agencies to exercise reasonable efforts to return children to their homes. See, Efaw, supra.
 {¶ 50} Father also cites Isaac v. Montgomery CountyChildren's Svc. Bd. (Dec. 14, 1994), Montgomery App. Nos. 14140 and 14200, for the proposition that a court errs in granting permanent custody to an agency when the agency fails to timely include the father in the case plan or provide him with minimally adequate direction or opportunity to be rehabilitated as a parent. In Isaac, the Second Appellate District noted that: "Without a timely filed case plan courts cannot be sure what, if anything, a children's services agency has communicated to the parents." The Isaac court found that: "Only the inability to locate a parent or other proof of impossibility to obtain a parent's agreement may relieve an agency of the minimal burden to attempt to include parents in a case plan pursuant to R.C.2151.412. But even if an agency believes reunification would be absolutely impossible to accomplish, it must still either include the parents in the case plan or must prove * * * by clear and convincing evidence, that a parent did not agree with the case plan or did not cooperate after being given some minimal opportunity to do so, and that the lack of cooperation was not substantially the agency's fault." Id.
 {¶ 51} This court has previously recognized that even when an agency has a duty to use reasonable efforts, an implied exception to required case planning efforts exists when those efforts would be futile. In re Leitwein, Hocking App. No. 03CA18,2004-Ohio-1296, at ¶ 30, citing Elmer v. Lucas Cty. Children'sSvcs. Bd. (1987), 36 Ohio App. 3d 241, 244; see also In reKramer, Franklin App. Nos. 02AP-1038 and 02AP-1039, 2003-Ohio-2277; In re Secrest, Montgomery App No. 19378, 2002-Ohio-7094; In re Norris (Dec. 12, 2000), Athens App. Nos. 00CA28 and 00CA41. We have also recognized that because "the appearance of futility may be furthered by the agency's acts and omissions[,] [t]rial courts should be cautious in finding that reasonable efforts would have been futile where an agency has chosen to ignore the natural parent." Efaw, supra, citing Inre Stevens (July 16, 1993), Montgomery App. No. 13523 andIsaac, supra. See, also, Leitwein, at ¶ 30.
 {¶ 52} Here, because the trial court relied upon R.C.2151.414(B)(1)(b) to terminate Father's parental rights, it did not make any explicit finding regarding Father's fitness to provide for Ethen. Nor did the court make any finding that the agency exercised reasonable efforts to reunite Ethen with Father, or make an express finding that such efforts would be futile pursuant to R.C. 2151.419(A)(1). However, the court's finding that Father abandoned Ethen obligated the court to make a determination that the agency was excused from making reasonable efforts with respect to Father. See R.C. 2151.419(A)(2)(d). Implicit in this obligatory finding is a determination that the parent's abandonment of the child renders reunification efforts futile.
 {¶ 53} In light of the particular circumstances of this case, i.e. the agency's complete failure to either include Father in the case plan or join him as a party until the filing of the permanent custody motion, it is appropriate to consider whether the agency's acts or omissions substantially contributed to the appearance of abandonment and futility of reasonable reunification efforts. The record does not reflect exactly when VCDJFS first learned of Father's existence and identity. However, the semi-annual review ("SAR"), conducted on December 14, 2004, and filed on January 4, 2005, indicates: "Father (Robert Perry) has not agreed to enter into a case plan." The SAR further states, "[Mother] has not been able to have contact with Ethen since being incarcerated. [Father] has called agency one time to see Ethen and came with Brenda on one visit. Worker does not know why he did not continue visiting after [Mother's] incarceration." Additionally, the SAR contains the following notation: "At this time, it is not known (sic) where [Father] is living."
 {¶ 54} VCDJFS supervisor Sara Zinn testified that Father chose not to participate in the case plan. Father's own testimony confirmed this. Father also acknowledged that he had a drug problem before entering the SEPTA program in August 2005, and that he declined to be involved in the case plan when its requirements dealt with the parents' drug issues. Further, he acknowledged that during one of his visits with Ethen, he took a drug test at the agency's request. Father admitted that he failed that drug test, and he did not recall having any further visitation with Ethen after taking the test.
 {¶ 55} Father acknowledged that the agency offered him his own visitation with Ethen, but that he never really looked into it because he was content to share Mother's visits. Moreover, during his testimony, Father repeatedly admitted that he did not pursue custody of Ethen himself because he believed Mother would obtain custody. On at least one occasion during his testimony, he indicated that he intended to obtain visitation through Mother once she obtained custody of Ethen. Additionally, Father testified that he never paid any support for Ethen, and he acknowledged several times that, at the time of the January 2006 hearing, he had not seen Ethen for about a year.
 {¶ 56} Thus, while VCDJFS failed to include Father in the case plan, the record reflects that: (1) the agency attempted to include Father in the case plan; (2) Father declined its efforts to include him in the case plan because it included provisions to deal with the parents' drug issues; (3) Father failed to provide any support for Ethen; (4) at the time of the final hearing, Father had not seen Ethen for almost one year; and (5) Father elected not to pursue custody of Ethen. This evidence demonstrates that additional reunification efforts by VCJFS would have been futile.
 {¶ 57} We note that the agency's better practice would be to include Father in the case plan, despite his repeated refusals to become involved, and document his success or failure in completing its requirements. However, the record before us contains competent credible evidence to support the trial court's finding that Father abandoned Ethen, and further demonstrates that the agency's own acts and/or omissions in failing to include Father in the case plan did not substantially contribute to the appearance of either Father's abandonment, or the futility of reasonable reunification efforts. Accordingly, we overrule each of Father's assignments of error and affirm the trial court's judgment as it relates to the termination of Father's parental rights.
 III. {¶ 58} In her sole assignment of error, Mother contends that the trial court abused its discretion by denying her motion to grant legal custody of Ethen to her parents, the Praters. Mother contends that the trial court acted arbitrarily and unreasonably when it determined that a grant of permanent custody to VCDJFS was in Ethen's best interest. Specifically, Mother asserts that, considering the best interest factors enumerated in R.C.2151.414(D), the trial court ignored evidence that: (1) the reason her parents terminated Ethen's initial placement was that the case plan placed both Mother and Ethen in their home, and given Mother's continued use of drugs and alcohol, they did not feel they could ensure Ethen's safety; (2) her parents were willing to resume Ethen's care when the case plan did not require them to house both Mother and Ethen; (3) Brenda consistently exercised visitation with Ethen at the agency before the agency terminated the Praters' visitation in February 2005; (4) it was the agency's fault that her parents did not exercise visitation with Ethen from February 2005 until the final hearing; (5) the agency blocked her parents' attempts to regain Ethen's placement in their home; (6) while her parents were unable to provide her with a legally secure placement during her childhood, they were able to provide a legally secure placement for her step-brother, Cory Clevinger.
 {¶ 59} R.C. 2151.353(A) grants a juvenile court broad discretion in the disposition of an abused, neglected, and/or dependent child case. It permits the court to make any of the following orders: (1) place the child in protective supervision; (2) commit the child to the temporary custody of a public children services agency, a private child placing agency, either parent, a relative residing within or outside the state, or a probation officer for placement in a certified family foster home or in any other home approved by the court; (3) award legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child; (4) commit the child to the permanent custody of a public children services agency or private child placing agency; or (5) place the child in long-term family foster care with a public children services agency.
 {¶ 60} The purpose of R.C. Chapter 2151 is "To provide for the care, protection, and mental and physical development of children * * *, whenever possible, in a family environment, separating the child from the child's parents only when necessary for the child's welfare or in the interests of public safety[.]" R.C. 2151.01(A). However, when choosing among placement alternatives, the court's primary consideration is the best interests of the child. See In re Pryor (1993),86 Ohio App.3d 327.
 {¶ 61} A child's best interests are served by placing him in a permanent situation that fosters growth, stability, and security. In re Adoption of Ridenour (1991), 61 Ohio St.3d 319,324. In determining whether granting an agency's motion for permanent custody is in a child's best interest, R.C. 2151.414(D) directs a trial court to consider certain factors including: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.
 {¶ 62} This court has recognized that R.C. 2151.353(A) does not require a juvenile court to consider relative placement before granting the motion for permanent custody. In re Keaton,
Ross App. Nos. 04CA2785 and 04CA2788, 2004-Ohio-6210, at ¶ 61, citing In re Dyal (Aug. 9, 2001), Hocking App. No. 01CA11; Inthe Matter of Knight (Mar. 22, 2000), Lorain App. Nos. 98CA7258 and 98CA7266. Moreover, relatives seeking the placement of the child do not have the benefit of the presumptive rights afforded to a child's natural parents as a matter of law, and the relative's willingness to care for the child does not alter the statutory factors to be considered in granting permanent custody. Id. citing, Dyal; In re Jefferson (Oct. 25, 2000), Summit App. Nos. 20092 and 20110; In re Davis (Oct. 12, 2000), Cuyahoga App. No. 77124. Thus, after considering all of the relevant statutory factors, a trial court is not required to favor placement with a relative if the analysis reveals that a grant of permanent custody to the agency is in the child's best interest. Id., citing In re Dyal, Hocking App No. 01CA11, 2001-Ohio-2383; see, also, In re Lewis, Athens App. No. 01CA20, 2001-Ohio-2618;In re Wilkenson, (Oct. 12, 2001), Hamilton App. No. C-010402, C-010408; In re Knight (Mar. 22, 2000), Lorain App. Nos. 98CA72589, 98CA726698.
 {¶ 63} Because the determination of which placement option is in the child's best interest rests in the trial court's sound discretion, we will not will not reverse that choice absent a showing that the court abused its discretion. In re Barnosky,
Athens App. No. 03CA32, 2004-Ohio-1127, at ¶ 31, citing In reMalone, Franklin App. No. 03AP-489, 2003-Ohio-7156, at 22; Inre Lewis, Athens App. No. 01CA20, 2001-Ohio-2618. An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. In applying the abuse of discretion standard of review, we are not free to merely substitute our judgment for that of the trial court. In re Jane Doe I (1991), 57 Ohio St.3d 135,137-138, citing Berk v. Matthews (1990), 53 Ohio St.3d 161,169. Rather, we give deference to the trial as the trier of fact because it is "best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77, 80.
 {¶ 64} Mother first challenges the trial court's findings with regard to Ethen's interactions and interrelationship to the Praters. See R.C. 2151.414(D)(1). In its findings, the court noted that the Praters received the first chance to care for Ethen when the agency placed him in their home from June 20 to July 15, 2004, but that they "gave up on the placement" by asking VCDJFS to remove him from their home. Additionally, the court found that the Praters did not visit with Ethen after Bruce's "tantrum" at the agency in February 2005.
 {¶ 65} While we note that the trial court was not required to make any findings related to the Praters, the court did not abuse its discretion by determining that Ethen's best interests required placing him with VCDJFS instead of the Praters. Mother contends that the trial court arbitrarily failed to consider the fact that the initial placement required the Praters to provide a home for both Mother and Ethen. In fact, the original case plan did not require both Mother and Ethen to reside in the Prater home. Instead, it provided only for Ethen's placement in the Praters' home, and states that "[Mother] is free to visit her son at her father and step-mother's home as long as she cooperates with the rules of their household and agency visitation rules. [Mother] is not to take Ethan (sic) unsupervised and leave the Praters' home." Further, in explaining the close proximity of Ethen's placement to Mother, and detailing any anticipated transportation obstacles, the case plan stated: "At this time, [Mother] is staying with her boyfriend on St. Rt. 93 in McArthur (sic). Bruce and Brenda have provided her transportation and it is anticipated she (sic) will do so again so she can see Ethen."
 {¶ 66} Moreover, even if the Praters believed that the case plan required them to house both Mother and Ethen, Brenda admitted that when the arrangement proved unsatisfactory, they did not ask the agency to remove Mother from their home or restrict her access to Ethen. Instead they chose to remove both Mother and Ethen from their home. Thus, despite Mother's assertions, the record contained some competent, credible evidence demonstrating that the Praters "gave up" on Ethen's placement even when the agency did not require them to provide a home for Mother.
 {¶ 67} Mother acknowledges that the Praters did not visit with Ethen for approximately one year, but argues that their failure to do so was entirely the agency's fault. However, the record reflects that in February 2005 the agency told Brenda it was stopping the Praters' visits because "they were threatening workers and they came into the office threatening people saying someone was going to get hurt." She further testified that after the agency terminated the Praters' unsupervised visitation with Ethen, the agency informed Brenda that she could attend visits with Mother at the agency. While Brenda denied that anyone at the agency ever told her that, she also admitted that she never inquired about resuming visitation. Thus, the record contained some competent credible evidence to support the trial court's conclusion that the Praters were at least partially responsible for their failure to visit Ethen after February 2005.
 {¶ 68} Next Mother contends that the agency caused Ethen's lengthy placement in foster care by ignoring the Praters request to have Ethen returned to their home. See R.C. 2151.414(D)(3). Once again, Mother relies upon her contention that the Praters were ready and willing to accept Ethen's placement in their home if Mother resided elsewhere. However, as we found above, the record contains some competent, credible evidence demonstrating that the Praters "gave up" on Ethen's placement even when the agency did not require them to provide a home for Mother.
 {¶ 69} Finally, Mother contends that the trial court abused its discretion when it determined that Ethen's need for a legally secure permanent placement could only be achieved with the grant of permanent placement to the agency. R.C. 2151.414(D)(4). Mother again challenges the trial court's determination that the Praters elected not to provide a legally secure placement for Ethen. Additionally, Mother asserts that the trial court arbitrarily determined that the Praters were unable to provide a legally secure placement for Ethen because they were unable to provide a legally secure placement for her when she was a child.
 {¶ 70} Mother asserts that the Praters are capable of providing a legally secure placement because they have been married for ten years and own their own home. Additionally, she notes that the Praters were able to provide a legally secure placement for Brenda's son, Cory Clevinger, when he was a child. While this may be true, Mother does not dispute that the Praters could not provide her with a legally secure placement during her own childhood.
 {¶ 71} Our review of the record also reflects that the Praters never filed a motion seeking permanent custody of Ethen. While they did file a motion to intervene early in the proceedings, that motion does not express an intention to seek permanent custody of Ethen. Rather, it sought to reinstate Ethen's temporary placement in the Praters' home as an alternative to foster care when his placement with Essalona Dawn Keller failed.
 {¶ 72} We have previously recognized that: "`* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent or other relative] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm.'"Keeton, supra at ¶ 58, quoting In re Bishop (1987),36 Ohio App.3d 123, 126, quoting In re East (1972), 32 Ohio Misc. 65,69. In light of the Praters' choice to remove Ethen from their home based upon Mother's conduct, their strained relationship with Mother, which Ms. Zinn characterized as "volatile," and their failure to provide Mother with a legally secure placement during her own childhood, we cannot find that the trial court abused its discretion by effectively determining that the Praters could not provide Ethen with a legally secure permanent placement.
 {¶ 73} The record contains some competent, credible evidence to support each of the trial court's findings regarding best interest factors enumerated in R.C. 2151.414(D). Therefore, we conclude that the trial court did not abuse its discretion in determining that the grant of permanent custody to VCDJFS is in Ethen's best interest. Accordingly, we overrule Mother's sole assignment of error and affirm the trial court's judgment.
JUDGMENT AFFIRMED.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED, and that the Appellee shall recover from the Appellants costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Vinton County Court of Common Pleas, Juvenile Division, to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Abele, J.: Concurs in Judgment and Opinion.
McFarland, J.: Concurs in Judgment only.
[1] We sua sponte consolidate these appeals for purposes of this decision.
[2] The record reflects that Bruce Prater is Mother's adoptive father, and that Brenda Prater is her adoptive step-mother.